Justice SCALIAdelivered the opinion of the Court.
The Clean Air Act directs the Environmental Protection Agency to regulate emissions of hazardous air pollutants from power plants if the Agency finds regulation "appropriate and necessary." We must decide whether it was reasonable for EPA to refuse to consider cost when making this finding.
I
The Clean Air Act establishes a series of regulatory programs to control air pollution from stationary sources (such as refineries and factories) and moving sources (such as cars and airplanes). 69 Stat. 322, as amended, 42 U.S.C. §§ 7401-7671q. One of these is the National Emissions Standards for Hazardous Air Pollutants Program-the hazardous-air-pollutants program, for short. Established in its current form by the Clean Air Act Amendments of 1990, 104 Stat. 2531, this program targets for regulation stationary-source emissions of more than 180 specified "hazardous air pollutants." § 7412(b).
For stationary sources in general, the applicability of the program depends in *2705 part on how much pollution the source emits. A source that emits more than 10 tons of a single pollutant or more than 25 tons of a combination of pollutants per year is called a major source. § 7412(a)(1). EPA is required to regulate all major sources under the program. § 7412(c)(1)-(2). A source whose emissions do not cross the just-mentioned thresholds is called an area source. § 7412(a)(2). The Agency is required to regulate an area source under the program if it "presents a threat of adverse effects to human health or the environment ... warranting regulation." § 7412(c)(3).
At the same time, Congress established a unique procedure to determine the applicability of the program to fossil-fuel-fired power plants. The Act refers to these plants as electric utility steam generating units, but we will simply call them power plants. Quite apart from the hazardous-air-pollutants program, the Clean Air Act Amendments of 1990 subjected power plants to various regulatory requirements. The parties agree that these requirements were expected to have the collateral effect of reducing power plants' emissions of hazardous air pollutants, although the extent of the reduction was unclear. Congress directed the Agency to "perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by [power plants] of [hazardous air pollutants] after imposition of the requirements of this chapter." § 7412(n)(1)(A). If the Agency "finds ... regulation is appropriate and necessary after considering the results of the study," it "shall regulate [power plants] under [§ 7412]." Ibid.EPA has interpreted the Act to mean that power plants become subject to regulation on the same terms as ordinary major and area sources, see 77 Fed.Reg. 9330 (2012), and we assume without deciding that it was correct to do so.
And what are those terms? EPA must first divide sources covered by the program into categories and subcategories in accordance with statutory criteria. § 7412(c)(1). For each category or subcategory, the Agency must promulgate certain minimum emission regulations, known as floor standards. § 7412(d)(1), (3). The statute generally calibrates the floor standards to reflect the emissions limitations already achieved by the best-performing 12% of sources within the category or subcategory. § 7412(d)(3). In some circumstances, the Agency may also impose more stringent emission regulations, known as beyond-the-floor standards. The statute expressly requires the Agency to consider cost (alongside other specified factors) when imposing beyond-the-floor standards. § 7412(d)(2).
EPA completed the study required by § 7412(n)(1)(A)in 1998, 65 Fed.Reg. 79826 (2000), and concluded that regulation of coal- and oil-fired power plants was "appropriate and necessary" in 2000, id.,at 79830. In 2012, it reaffirmed the appropriate-and-necessary finding, divided power plants into subcategories, and promulgated floor standards. The Agency found regulation "appropriate" because (1) power plants' emissions of mercury and other hazardous air pollutants posed risks to human health and the environment and (2) controls were available to reduce these emissions. 77 Fed.Reg. 9363. It found regulation "necessary" because the imposition of the Act's other requirements did not eliminate these risks. Ibid.EPA concluded that "costs should not be considered" when deciding whether power plants should be regulated under § 7412. Id.,at 9326.
In accordance with Executive Order, the Agency issued a "Regulatory Impact Analysis" alongside its regulation. This analysis estimated that the regulation would *2706 force power plants to bear costs of $9.6 billion per year. Id.,at 9306. The Agency could not fully quantify the benefits of reducing power plants' emissions of hazardous air pollutants; to the extent it could, it estimated that these benefits were worth $4 to $6 million per year.Ibid.The costs to power plants were thus between 1,600 and 2,400 times as great as the quantifiable benefits from reduced emissions of hazardous air pollutants. The Agency continued that its regulations would have ancillary benefits-including cutting power plants' emissions of particulate matter and sulfur dioxide, substances that are not covered by the hazardous-air-pollutants program. Although the Agency's appropriate-and-necessary finding did not rest on these ancillary effects, id.,at 9320, the regulatory impact analysis took them into account, increasing the Agency's estimate of the quantifiable benefits of its regulation to $37 to $90 billion per year, id.,at 9306. EPA concedes that the regulatory impact analysis "played no role" in its appropriate-and-necessary finding. Brief for Federal Respondents 14.
Petitioners (who include 23 States) sought review of EPA's rule in the Court of Appeals for the D.C. Circuit. As relevant here, they challenged the Agency's refusal to consider cost when deciding whether to regulate power plants. The Court of Appeals upheld the Agency's decision not to consider cost, with Judge Kavanaugh concurring in part and dissenting in part. White Stallion Energy Center, LLC v. EPA,748 F.3d 1222 (2014)(per curiam). We granted certiorari. 574 U.S. ----, 135 S.Ct. 702, 703, 190 L.Ed.2d 434 (2014).
II
Federal administrative agencies are required to engage in "reasoned decisionmaking." Allentown Mack Sales & Service, Inc. v. NLRB,522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998)(internal quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." Ibid.It follows that agency action is lawful only if it rests "on a consideration of the relevant factors." Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)(internal quotation marks omitted).
EPA's decision to regulate power plants under § 7412allowed the Agency to reduce power plants' emissions of hazardous air pollutants and thus to improve public health and the environment. But the decision also ultimately cost power plants, according to the Agency's own estimate, nearly $10 billion a year. EPA refused to consider whether the costs of its decision outweighed the benefits. The Agency gave cost no thought at all,because it considered cost irrelevant to its initial decision to regulate.
EPA's disregard of cost rested on its interpretation of § 7412(n)(1)(A), which, to repeat, directs the Agency to regulate power plants if it "finds such regulation is appropriate and necessary." The Agency accepts that it couldhave interpreted this provision to mean that cost is relevant to the decision to add power plants to the program. Tr. of Oral Arg. 44. But it chose to read the statute to mean that cost makes no difference to the initial decision to regulate. See 76 Fed.Reg. 24988 (2011)("We further interpret the term 'appropriate' to not allow for the consideration of costs"); 77 Fed.Reg. 9327("Cost does not have to be read into the definition of 'appropriate' ").
We review this interpretation under the standard set out in Chevron U.S.A.
*2707 Inc. v. Natural Resources Defense Council, Inc.,467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Chevrondirects courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers.Id.,at 842-843, 104 S.Ct. 2778. Even under this deferential standard, however, "agencies must operate within the bounds of reasonable interpretation." Utility Air Regulatory Group v. EPA,573 U.S. ----, ----, 134 S.Ct. 2427, 2442, 189 L.Ed.2d 372 (2014)(internal quotation marks omitted). EPA strayed far beyond those bounds when it read § 7412(n)(1)to mean that it could ignore cost when deciding whether to regulate power plants.
A
The Clean Air Act treats power plants differently from other sources for purposes of the hazardous-air-pollutants program. Elsewhere in § 7412, Congress established cabined criteria for EPA to apply when deciding whether to include sources in the program. It required the Agency to regulate sources whose emissions exceed specified numerical thresholds (major sources). It also required the Agency to regulate sources whose emissions fall short of these thresholds (area sources) if they "presen[t] a threat of adverse effects to human health or the environment ... warranting regulation." § 7412(c)(3). In stark contrast, Congress instructed EPA to add power plants to the program if (but only if) the Agency finds regulation "appropriate and necessary." § 7412(n)(1)(A). One does not need to open up a dictionary in order to realize the capaciousness of this phrase. In particular, "appropriate" is "the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." 748 F.3d, at 1266(opinion of Kavanaugh, J.). Although this term leaves agencies with flexibility, an agency may not "entirely fai[l] to consider an important aspect of the problem" when deciding whether regulation is appropriate. State Farm, supra,at 43, 103 S.Ct. 2856.
Read naturally in the present context, the phrase "appropriate and necessary" requires at least some attention to cost. One would not say that it is even rational, never mind "appropriate," to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits. In addition, "cost" includes more than the expense of complying with regulations; any disadvantage could be termed a cost. EPA's interpretation precludes the Agency from considering anytype of cost-including, for instance, harms that regulation might do to human health or the environment. The Government concedes that if the Agency were to find that emissions from power plants do damage to human health, but that the technologies needed to eliminate these emissions do even more damage to human health, it would stilldeem regulation appropriate. See Tr. of Oral Arg. 70. No regulation is "appropriate" if it does significantly more harm than good.
There are undoubtedly settings in which the phrase "appropriate and necessary" does not encompass cost. But this is not one of them. Section 7412(n)(1)(A)directs EPA to determine whether "regulationis appropriate and necessary." (Emphasis added.) Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate. Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages andthe disadvantages of agency decisions. It also reflects the reality that "too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively *2708 with other (perhaps more serious) problems." Entergy Corp. v. Riverkeeper, Inc.,556 U.S. 208, 233, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009)(BREYER, J., concurring in part and dissenting in part). Against the backdrop of this established administrative practice, it is unreasonable to read an instruction to an administrative agency to determine whether "regulation is appropriate and necessary" as an invitation to ignore cost.
Statutory context reinforces the relevance of cost. The procedures governing power plants that we consider today appear in § 7412(n)(1), which bears the caption "Electric utility steam generating units." In subparagraph (A), the part of the law that has occupied our attention so far, Congress required EPA to study the hazards to public health posed by power plants and to determine whether regulation is appropriate and necessary. But in subparagraphs (B) and (C), Congress called for two additional studies. One of them, a study into mercury emissions from power plants and other sources, must consider "the health and environmental effects of such emissions, technologies which are available to control such emissions, and the costs of such technologies." § 7412(n)(1)(B)(emphasis added). This directive to EPA to study cost is a further indication of the relevance of cost to the decision to regulate.
In an effort to minimize this express reference to cost, EPA now argues that § 7412(n)(1)(A)requires it to consider only the study mandated by that provision, not the separate mercury study, before deciding whether to regulate power plants. But when adopting the regulations before us, the Agency insisted that the provisions concerning all three studies "provide a framework for [EPA's] determination of whether to regulate [power plants]." 76 Fed.Reg. 24987. It therefore decided "to interpret the scope of the appropriate and necessary finding in the context of all three studies." 77 Fed.Reg. 9325(emphasis added). For example:
• EPA considered environmental effects relevant to the appropriate-and-necessary finding. It deemed the mercury study's reference to this factor "direct evidence that Congress was concerned with environmental effects." 76 Fed.Reg. 24987.
• EPA considered availability of controls relevant to the appropriate-and-necessary finding. It thought that doing so was "consistent with" the mercury study's reference to availability of controls. Id., at 24989.
• EPA concluded that regulation of power plants would be appropriate and necessary even if a single pollutant emitted by them posed a hazard to health or the environment. It believed that "Congress' focus" on a single pollutant in the mercury study "support[ed]" this interpretation. Ibid.
EPA has not explained why § 7412(n)(1)(B)'s reference to "environmental effects ... and ... costs" provides "direct evidence that Congress was concerned with environmental effects," but not "direct evidence" that it was concerned with cost. Chevronallows agencies to choose among competing reasonable interpretations of a statute; it does not license interpretive gerrymanders under which an agency keeps parts of statutory context it likes while throwing away parts it does not.
B
EPA identifies a handful of reasons to interpret § 7412(n)(1)(A)to mean that cost is irrelevant to the initial decision to regulate. We find those reasons unpersuasive.
EPA points out that other parts of the Clean Air Act expressly mention cost, *2709 while § 7412(n)(1)(A)does not. But this observation shows only that § 7412(n)(1)(A)'s broad reference to appropriateness encompasses multiple relevant factors (which include but are not limited to cost); other provisions' specific references to cost encompass just cost. It is unreasonable to infer that, by expressly making cost relevant to other decisions, the Act implicitly makes cost irrelevant to the appropriateness of regulating power plants. (By way of analogy, the Fourth Amendment's Reasonableness Clause requires searches to be "[r]easonable," while its Warrant Clause requires warrants to be supported by "probable cause." Nobody would argue that, by expressly making level of suspicion relevant to the validity of a warrant, the Fourth Amendment implicitly makes level of suspicion categorically irrelevantto the reasonableness of a search. To the contrary, all would agree that the expansive word "reasonable" encompasses degree of suspicion alongside other relevant circumstances.) Other parts of the Clean Air Act also expressly mention environmental effects, while § 7412(n)(1)(A)does not. Yet that did not stop EPA from deeming environmental effects relevant to the appropriateness of regulating power plants.
Along similar lines, EPA seeks support in this Court's decision in Whitman v. American Trucking Assns., Inc.,531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). There, the Court addressed a provision of the Clean Air Act requiring EPA to set ambient air quality standards at levels "requisite to protect the public health" with an "adequate margin of safety." 42 U.S.C. § 7409(b). Read naturally, that discrete criterion does not encompass cost; it encompasses health and safety. The Court refused to read that provision as carrying with it an implicit authorization to consider cost, in part because authority to consider cost had "elsewhere, and so often, been expressly granted." 531 U.S., at 467, 121 S.Ct. 903. American Truckingthus establishes the modest principle that where the Clean Air Act expressly directs EPA to regulate on the basis of a factor that on its face does not include cost, the Act normally should not be read as implicitly allowing the Agency to consider cost anyway. That principle has no application here. "Appropriate and necessary" is a far more comprehensive criterion than "requisite to protect the public health"; read fairly and in context, as we have explained, the term plainly subsumes consideration of cost.
Turning to the mechanics of the hazardous-air-pollutants program, EPA argues that it need not consider cost when first deciding whetherto regulate power plants because it can consider cost later when deciding how muchto regulate them. The question before us, however, is the meaning of the "appropriate and necessary" standard that governs the initial decision to regulate. And as we have discussed, context establishes that this expansive standard encompasses cost. Cost may become relevant again at a later stage of the regulatory process, but that possibility does not establish its irrelevance at thisstage. In addition, once the Agency decides to regulate power plants, it must promulgate certain minimum or floor standards no matter the cost (here, nearly $10 billion a year); the Agency may consider cost only when imposing regulations beyondthese minimum standards. By EPA's logic, someone could decide whether it is "appropriate" to buy a Ferrari without thinking about cost, because he plans to think about cost later when deciding whether to upgrade the sound system.
EPA argues that the Clean Air Act makes cost irrelevant to the initial decision to regulate sources other than *2710 power plants. The Agency claims that it is reasonable to interpret § 7412(n)(1)(A)in a way that "harmonizes" the program's treatment of power plants with its treatment of other sources. This line of reasoning overlooks the whole point of having a separate provision about power plants: treating power plants differentlyfrom other stationary sources. Congress crafted narrow standards for EPA to apply when deciding whether to regulate other sources; in general, these standards concern the volume of pollution emitted by the source, § 7412(c)(1), and the threat posed by the source "to human health or the environment," § 7412(c)(3). But Congress wrote the provision before us more expansively, directing the Agency to regulate power plants if "appropriate and necessary." "That congressional election settles this case. [The Agency's] preference for symmetry cannot trump an asymmetrical statute." CSX Transp., Inc. v. Alabama Dept. of Revenue,562 U.S. 277, 296, 131 S.Ct. 1101, 179 L.Ed.2d 37 (2011).
EPA persists that Congress treated power plants differently from other sources because of uncertainty about whether regulation of power plants would still be needed after the application of the rest of the Act's requirements. That is undoubtedly oneof the reasons Congress treated power plants differently; hence § 7412(n)(1)(A)'s requirement to study hazards posed by power plants' emissions "after imposition of the requirements of [the rest of the Act]." But if uncertainty about the need for regulation were the onlyreason to treat power plants differently, Congress would have required the Agency to decide only whether regulation remains "necessary," not whether regulation is "appropriate andnecessary." In any event, EPA stated when it adopted the rule that "Congress did not limit [the] appropriate and necessary inquiry to [the study mentioned in § 7412(n)(1)(A)]." 77 Fed.Reg. 9325. The Agency instead decided that the appropriate-and-necessary finding should be understood in light of all three studies required by § 7412(n)(1), and as we have discussed, one of those three studies reflects concern about cost.
C
The dissent does not embrace EPA's far-reaching claim that Congress made costs altogether irrelevant to the decision to regulate power plants. Instead, it maintains that EPA need not "explicitly analyze costs" before deeming regulation appropriate, because other features of the regulatory program will on their own ensure the cost-effectiveness of regulation. Post, at 2714 (opinion of KAGAN, J.). This line of reasoning contradicts the foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action. SEC v. Chenery Corp.,318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943). When it deemed regulation of power plants appropriate, EPA said that cost was irrelevantto that determination-not that cost-benefit analysis would be deferred until later. Much less did it say (what the dissent now concludes) that the consideration of cost at subsequent stages will ensure that the costs are not disproportionate to the benefits. What it said is that cost is irrelevant to the decision to regulate.
That is enough to decide these cases. But for what it is worth, the dissent vastly overstates the influence of cost at later stages of the regulatory process. For example, the dissent claims that the floor standards-which the Act calibrates to reflect emissions limitations already achieved by the best-performing sources in the industry-reflect cost considerations, because the best-performing power plants "must have considered costs in arriving at *2711 their emissions outputs."Post, at 2719. EPA did not rely on this argument, and it is not obvious that it is correct. Because power plants are regulated under other federal and state laws, the best-performing power plants' emissions limitations might reflect cost-blind regulation rather than cost-conscious decisions. Similarly, the dissent suggests that EPA may consider cost when dividing sources into categories and subcategories. Post, at 2720. Yet according to EPA, "it is notappropriate to premise subcategorization on costs." 77 Fed.Reg. 9395(emphasis added). That statement presumably explains the dissent's carefully worded observation that EPA considered "technological, geographic, and other factors" when drawing categories, post, at 2720, n. 4, which factors were in turn "related to costs" in some way, post, at 2719. Attenuated connections such as these hardly support the assertion that EPA's regulatory process featured "exhaustive consideration of costs," post,at 2714.
All in all, the dissent has at most shown that some elements of the regulatory scheme mitigate cost in limited ways; it has not shown that these elements ensure cost-effectiveness. If (to take a hypothetical example) regulating power plants would yield $5 million in benefits, the prospect of mitigating cost from $11 billion to $10 billion at later stages of the program would not by itself make regulation appropriate. In all events, we need not pursue these points, because EPA did not say that the parts of the regulatory program mentioned by the dissent prevent the imposition of costs far in excess of benefits. "[EPA's] action must be measured by what [it] did, not by what it might have done." Chenery, supra,at 93-94, 63 S.Ct. 454.
D
Our reasoning so far establishes that it was unreasonable for EPA to read § 7412(n)(1)(A)to mean that cost is irrelevant to the initial decision to regulate power plants. The Agency must consider cost-including, most importantly, cost of compliance-before deciding whether regulation is appropriate and necessary. We need not and do not hold that the law unambiguously required the Agency, when making this preliminary estimate, to conduct a formal cost-benefit analysis in which each advantage and disadvantage is assigned a monetary value. It will be up to the Agency to decide (as always, within the limits of reasonable interpretation) how to account for cost.
Some of the respondents supporting EPA ask us to uphold EPA's action because the accompanying regulatory impact analysis shows that, once the rule's ancillary benefits are considered, benefits plainly outweigh costs. The dissent similarly relies on these ancillary benefits when insisting that "the outcome here [was] a rule whose benefits exceed its costs." Post, at 2722. As we have just explained, however, we may uphold agency action only upon the grounds on which the agency acted. Even if the Agency couldhave considered ancillary benefits when deciding whether regulation is appropriate and necessary-a point we need not address-it plainly did not do so here. In the Agency's own words, the administrative record "utterly refutes [the] assertion that [ancillary benefits] form the basis for the appropriate and necessary finding." 77 Fed.Reg. 9323. The Government concedes, moreover, that "EPA did not rely on the [regulatory impact analysis] when deciding to regulate power plants," and that "[e]ven if EPA had considered costs, it would not necessarily have adopted ... the approach set forth in [that analysis]." Brief for Federal Respondents 53-54.
* * *
*2712 We hold that EPA interpreted § 7412(n)(1)(A)unreasonably when it deemed cost irrelevant to the decision to regulate power plants. We reverse the judgment of the Court of Appeals for the D.C. Circuit and remand the cases for further proceedings consistent with this opinion.
It is so ordered.