KAVANAUGH, Circuit Judge,
dissenting:
EPA must consider both costs and benefits before it vetoes or revokes a permit under Section 404 of the Clean Water Act. That much is common sense and settled law. See Michigan v. EPA, — U.S. -, 135 S.Ct. 2699, 192 L.Ed.2d 674 (2015). Here, however, EPA revoked a Clean Water Act permit without considering the costs of doing so. For that reason, EPA’s decision must be vacated. In my view, EPA must go back to the drawing board and weigh both the costs and benefits of revoking the permit before making its decision.
The case concerns Mingo Logan, a coal mining company that planned to engage in surface coal mining in West Virginia. Under the Clean Water Act, the Company first needed to obtain what is known as a Section 404 permit. The Section 404 permit would allow Mingo Logan to dump into nearby streams the excess rubble generated by its surface mining operation — known under the Act as “fill material.” Mingo Logan’s ability to dispose of fill material into those streams was critical to the via *731 bility of the Company’s planned coal mining operation.
By statute, the Army Corps of Engineers oversees Section 404 permits. The Corps has the power to grant and revoke permits. To grant a Section 404 permit, the Corps must determine that the permit application meets guidelines developed jointly by the Corps and EPA. Among other things, the guidelines require the permit applicant to show that its planned disposal of fill material minimizes environmental impacts, to the extent practicable.' The Corps may also revoke a previously issued Section 404 permit, but only after the Corps considers a variety of factors such as the permittee’s investment-backed reliance on the permit.
In addition, Section 404(c) of the Clean Water Act grants EPA concurrent authority to (i) veto the issuance of a permit or (ii) revoke a previously issued permit.[1] To either veto or revoke a permit, EPA must determine that a permittee’s disposal of fill material at a given site “will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.” 33 U.S.C. § 1344(c) (emphasis added).
In 2007, Mingo Logan obtained a Section 404 permit from the Corps. By its terms, the permit allowed the Company to dispose of fill material for 24 years at three disposal sites, subject to various conditions and mitigation measures. Understandably relying on that permit, Mingo Logan subsequently spent millions of dollars on the mining operation and hired coal miners and other employees.
In 2007, EPA could have exercised its Section 404(c) authority to veto the issuance of Mingo Logan’s permit, but EPA chose not to do so. In 2011, EPA reversed course and exercised its Section 404(c) authority to revoke Mingo Logan’s permit and shut down the mining operation.
EPA provided one reason for its 2011 revocation decision: Contrary to what it had concluded four years earlier, EPA now believed that Mingo Logan’s coal mining operation would have an “unacceptable adverse effect” on certain animals, particularly certain species,of salamanders, fish, and birds. (There was no stated risk to humans or to drinking water from Mingo Logan’s disposal of fill material into the streams.) In EPA’s view, revoking Mingo Logan’s permit would mitigate the adverse effect on animals.
Mingo Logan complains that EPA considered only the benefits and did not consider any of the costs associated with revoking Mingo Logan’s permit. Those costs encompassed, for example, the negative financial impacts on Mingo Logan’s owners and shareholders, including those who relied on the permit; on the coal miners who would lose their jobs; on the collateral businesses that sold services and products for the mining operation or otherwise depended on the mining operation; on the consumers who pay less for electricity when additional sources of energy are available; and on West Virginia’s tax revenues. According to Mingo Logan, EPA also failed to provide the “more detailed justification” required by Supreme Court precedent when an agency changes course and revokes a previously issued permit on which the permittee had relied. FCC v. Fox Television Stations, Inc., 556 U.S. *732 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009).
The bottom line is that EPA considered the benefits to animals of revoking the permit, but EPA never considered the costs to humans — coal miners, Mingo Logan’s shareholders, local businesses, and the like — of revoking the permit. In my view, EPA’s utterly one-sided analysis did not come close to satisfying the agency’s duty under the Administrative Procedure Act and relevant Supreme Court precedents to consider and justify the costs of revoking Mingo Logan’s previously issued permit.
To be clear, I am not here deciding how EPA should weigh the costs and benefits of revoking the permit, or what outcome the agency should reach when it conducts that analysis. Cf. Michigan, 135 S.Ct. at 2711 (same); White Stallion Energy Center, LLC v. EPA, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J., dissenting) (same). I am merely making the narrow but critical point that EPA must in fact consider both costs and benefits before deciding whether to revoke the permit. See Michigan, 135 S.Ct. 2699. EPA did not do so here. Under the Administrative Procedure Act and applicable Supreme Court precedent, that is not acceptable. I respectfully dissent.
I
By omitting consideration of costs, EPA’s decision revoking Mingo Logan’s permit was doubly deficient under the Administrative Procedure Act. First, EPA failed its most basic duty under the Administrative Procedure Act to consider all of the relevant factors, including costs. Second, because EPA changed its position by revoking a previously issued permit, EPA not only had to consider costs, but also had to provide a more detailed justification for its change in position.
A
It is a fundamental principle of administrative law that federal “administrative agencies are required to engage in reasoned decisionmaking.” Michigan v. EPA, — U.S. -, 135 S.Ct. 2699, 2706, 192 L.Ed.2d 674 (2015) (internal quotation marks omitted). To engage in reasoned decisionmaking, an agency must consider all of the factors that are relevant to the particular decision facing the agency. Id. In other words, an agency must consider each “important aspect of the problem.” Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). An agency must also articulate a “rational connection” between the factors considered and the choice made. Id. In short, agency action must be “reasonable and reasonably explained.” Communities for a Better Environment v. EPA, 748 F.3d 333, 335 (D.C. Cir. 2014).
As a general rule, the costs of an agency’s action are a relevant factor that the agency must consider before deciding whether to act. See Michigan, 135 S.Ct. at 2707. In Michigan v. EPA, the Supreme Court was unanimous in articulating this principle. The Court divided 5-4 only on whether the agency had in fact considered costs. Id. at 2714 (Kagan, J., dissenting) (“I agree with the majority — let there be no doubt about this — that EPA’s power plant regulation would be unreasonable if the Agency gave cost no thought at all.”) (internal quotation marks and brackets omitted).
An agency must consider costs because reasoned decisionmaking requires assessing whether a proposed action would do more good than harm. As the Supreme Court has emphasized, the costs imposed *733 by the agency’s action are an integral part of that calculus: “Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.” Id. at 2707 (majority opinion).
Leading jurists and scholars have long recognized that consideration of costs is an essential component of reasoned decision-making under the Administrative Procedure Act. Consider the following:
• Justice Kagan: “[W]hat does it take in a statute to make us say, look, Congress has demanded that the regulation here occur without any attention to costs? In other words, essentially Congress has demanded that the regulation has occurred in a fundamentally silly way.” Tr. of Oral Arg. at 13, EPA v. EME Homer City Generation, L.P., — U.S. —, 134 S.Ct. 1584, 188 L.Ed.2d 775 (2014).
• Justice Breyer: “[I]t would make no sense to require [power] plants to spend billions to save one more fish or plankton. That is so even if the industry might somehow afford those billions.” Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 232-33, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009) (opinion of Breyer, J.) (internal quotation marks and citation omitted).
• Justice Breyer: Every agency choice “requires a decisionmaker to weigh advantages against disadvantages, and disadvantages can be seen in terms of (often quantifiable) costs.” Id. at 232, 129 S.Ct. 1498.
• Professor Sunstein: “A rational system of regulation looks not at the magnitude of the risk alone, but assesses the risk in comparison to the costs.” Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 Harv. L. Rev. 405, 493 (1989).
• Professor Pierce: “All individuals and institutions naturally and instinctively consider costs in making any important decision-[I]t is often impossible for a regulatory agency to make a rational decision without considering costs in some way.” Richard J. Pierce, Jr., The Appropriate Role of Costs in Environmental Regulation, 54 Admin. L. Rev. 1237, 1247 (2002).
To be sure, Congress may bar an agency from considering the costs of certain actions. See Whitman v. American Trucking Associations, 531 U.S. 457, 464-71, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). But absent a congressional directive to disregard costs, common administrative practice and common sense require an agency to consider the costs and benefits of its proposed actions, and to reasonably decide and explain whether , the benefits outweigh the costs.
In this case, instead of considering the costs and benefits of revoking Mingo Logan’s permit, EPA focused like a laser on one benefit that would flow from the revocation — namely, the prevention of an adverse effect on a few animals, such as salamanders, fish, and birds in and near the disposal sites. (To reiterate, there was no stated risk to humans or to drinking water from Mingo Logan’s disposal of fill material into the streams.)
But EPA ignored the costs to humans caused by the revocation of Mingo Logan’s permit, such as the harm to Mingo Logan’s owners and shareholders and to the coal miners who had been or would be employed at the mine. By ignoring costs, EPA in essence discounted the costs to humans all the way to zero. That’s how EPA was able to conclude that the harm to some salamanders, fish, and birds from the mining operation outweighed the loss of jobs for hundreds of coal miners, the financial harm to Mingo Logan’s owners and *734 shareholders, and the many other costs from revoking the permit.
EPA ignored the costs to humans because, in EPA’s view, Congress prohibited the agency from considering costs under Section 404(c). Section 404(c), to repeat, authorizes EPA to prohibit the disposal of fill material into any disposal site if EPA determines that the disposal “will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.” 33 U.S.C. § 1344(c) (emphasis added).
According to EPA, the phrase “unacceptable adverse effect” bars EPA from considering costs, or may be reasonably construed to allow EPA to ignore costs. But EPA is badly mistaken. Far from prohibiting EPA from considering the costs of its actions, Section 404(c) reinforces the agency’s bedrock duty under the Administrative Procedure Act to consider costs.
The word “unacceptable” is capacious and necessarily encompasses consideration of costs. Like the word “appropriate” at issue in Michigan v. EPA, the words “acceptable” and “unacceptable” are commonly understood to necessitate a balancing of costs and benefits. See Michigan, 135 S.Ct. at 2707-08; cf. Turner v. Murray, 476 U.S. 28, 36, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (“[W]e find the risk that racial prejudice may have infected petitioner’s capital sentencing unacceptable in light of the ease with which that risk could have been minimized.”).
To illustrate, suppose that the disposal of fill material from a surface mining project is certain to harm some.salamanders. Does the disposal activity have an “unacceptable adverse effect” on salamanders? The answer would presumably be yes if the disposal activity could be prohibited at zero cost — say, if the fill material could just as easily be dumped at another site devoid of salamanders. On the other hand, the answer would presumably be no if the mining project would contribute millions of dollars to the local economy and lower the price of electricity. In some cases, the question of whether the adverse effect on salamanders is “unacceptable” may be a close call. But the point for present purposes is that the balance of the benefits of reducing the adverse effect on animals and the costs of shutting down the mining operation plainly influences the determination whether or not the adverse effect is “unacceptable.”
Indeed, consider an analogous phrase recently analyzed by the Supreme Court: undue burden. See Whole Woman’s Health v. Hellerstedt, — U.S. -, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016). The Supreme Court explained that in assessing whether a law constitutes an “undue burden” on abortion access, courts must “consider the burdens a law imposes on abortion access together with the benefits those laws confer.” Id. at 2298. If the word “undue” at issue in Whole Woman’s Health requires a balancing of costs and benefits, the word “unacceptable” at issue here similarly requires a balancing of costs and benefits.
Moreover, even if the word “unacceptable” does not unambiguously require EPA to consider costs, it certainly allows EPA to consider costs. Cf. Michigan v. EPA, 213 F.3d 663, 674-79 (D.C. Cir. 2000) (per curiam) (statutory term “significant” allowed EPA to consider costs). And if the word “unacceptable” allows EPA to consider costs, it is necessarily unreasonable for EPA not to consider costs. See Michigan, 135 S.Ct. at 2706-08. That proposition follows from the general reasonableness principle embodied in State Farm and Chevron: To act reasonably, an agency must consider the costs of its actions unless *735 Congress has barred consideration of costs.
So whether EPA’s interpretation of Section 404(c) is analyzed under Chevron step one or Chevron step two or State Farm, the conclusion is the same: In order to act reasonably, EPA must consider costs before exercising its Section 404(c) authority to veto or revoke a permit.
EPA responds that Section 404(c) is more akin to the statutory provision at issue in Whitman v. American Trucking than the provision at issue in the Supreme Court’s Michigan v. EPA case. Whitman dealt with a provision of the Clean Air Act that directed EPA to set ambient air quality standards at levels “requisite to protect the public health” with “an adequate margin of safety.” 42 U.S.C. § 7409(b)(1). The Court said that the statute precluded EPA from considering costs.
EPA advanced the same Whitman-based argument in Michigan v. EPA. It failed. Here too, EPA’s reliance on Whitman is misplaced. In Whitman, the Court explained that the statute specifically focused on “public health” and “safety” — two factors on the other side of the balance from costs. See Whitman, 531 U.S. at 468-69, 121 S.Ct. 908. The Court found it “implausible” that Congress — through the modest words “requisite” and “adequate margin” — granted EPA the significant power “to determine whether implementation costs should moderate national air quality standards.” Whitman, 531 U.S. at 468, 121 S.Ct. 903.
Here, by contrast, Section 404(c)’s text — in particular ■ the word “unacceptable” — contemplates that costs must be considered. So does the statutory context and purpose: After all, it would be surprising— shocking, truth be told — if EPA did not have to consider costs under Section 404(c) when deciding whether to veto or revoke permits.
In short, bedrock principles of administrative law, as well as the terms of the statute setting forth EPA’s substantive authority to revoke permits, required EPA to consider the costs of revoking Mingo Logan’s permit. By failing to do so, EPA-ignored “an important aspect of the problem.” State Farm, 463 U.S. at 43, 103 S.Ct. 2856.
B
In this case, moreover, EPA’s failure to consider costs was doubly problematic because EPA changed its position in 2011 by revoking a permit previously issued in 2007. It would be bad enough if EPA had merely blocked issuance of a Section 404 permit without considering costs. But it is far worse that here, EPA changed course and revoked a previously issued permit without considering costs, including the costs of reliance on the permit.
As a general rule, when an agency changes an existing policy or changes its position on an issue, the agency “need not demonstrate to a court’s satisfaction that the reasons for the new policy are better than the reasons for the old one.” FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). The agency must show only that there are “good reasons” for the new policy or position. Id.
But the Supreme Court has carefully articulated an exception to that general principle: An agency must provide a “more detailed justification” for a change in position if the agency’s prior position “engendered serious reliance interests.” Id.; see also Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 742, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). “In such cases it is not that further-‘justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disre *736 garding facts and circumstances that underlay or were engendered by the prior policy.” Fox, 556 U.S. at 515-16, 129 S.Ct. 1800.
The Supreme Court’s recent decision in Encino Motorcars, LLC v. Navarro, — U.S. -, 136 S.Ct. 2117, 195 L.Ed.2d 382 (2016), illustrates the point. In that case, the Department of Labor changed its longstanding interpretation of the Fair Labor Standards Act. The retail car and truck dealership industry had long relied on the Department’s prior interpretation. When justifying its change in position, the Department nonetheless failed to consider the industry’s reliance. Id. at 2121-24, 2126. The Supreme Court found the Department’s change in course problematic. The Court said that, in light of the industry reliance on the Department’s prior position, “the Department needed a more reasoned explanation for its decision to depart” from its prior interpretation of the Fair Labor Standards Act. Id. at 2126-27.
The Supreme Court requires a “more reasoned” or “more detailed” justification in those circumstances because an agency change that undermines serious reliance interests disrupts settled expectations, thereby imposing a significant cost on regulated parties and contravening basic notions of due process and fundamental fairness. Here, as elsewhere, the law seeks to protect those kinds of settled expectations. Cf. Landgraf v. USI Film Products, 511 U.S. 244, 265, 114 S.Ct. 1483 (1994), 128 L.Ed.2d 229 (“settled expectations should not be lightly disrupted”); Hilton v. South Carolina Public Railways Commission, 502 U.S. 197, 202, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) (“Stare decisis has added force when the legislature, in the public sphere, and citizens, in the private realm, have acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled rights and expectations_”).
Put another way, when an agency changes position in a way that frustrates reliance interests, the agency’s action is more costly to regulated parties than when the agency develops a policy or announces a decision on a clean slate, all else being equal. This is a commonplace phenomenon in law and life. To take one example, declining to hire someone is usually less disruptive to the individual than firing someone. In the administrative context, the presence of that extra cost — the reliance cost — triggers a heightened burden of agency justification: The agency must consider the reliance cost and must justify its action despite that additional cost.
To be sure, as Justice Ginsburg pointed out in her concurring opinion in Encino Motorcars, the presence of reliance interests does not “pose an insurmountable obstacle” to an agency’s desired change in course. Encino Motorcars, — U.S. at -, 136 S.Ct. at 2128 n. 2 (Ginsburg, J., concurring). But reliance does pose an obstacle. And the agency must take that obstacle into account. As Justice Ginsburg put it, the agency must determine that “the benefits of [its desired action] outweigh those costs.” Id. at 2121-22.
Reliance interests pose an especially formidable obstacle to an agency’s desired change in course in the context of government-issued permitting. A government-issued permit typically embodies a limited-time bargain between a private party and the relevant government agency. If the private party complies with the permit’s conditions, the government will allow the party to engage in certain conduct— whether driving a truck, building a new store, or disposing of fill material, for example — for a specified period of time. Therefore, the issuance of a permit is typically intended to, and typically does, en *737 gender reliance by the permittee: The permit induces the driver to buy a truck, the builder to start construction, the miner to invest in its operation.
When a permit induces reliance, it has long been recognized that those settled expectations should not be lightly disturbed by intervening government action. See, e.g., Dainese v. Cooke, 91 U.S. 580, 583-84, 1 Otto 580, 23 L.Ed. 251 (1875) (The government “should make a clear case of departure from the permit, or danger to public interests, before appellant should be arrested midway in the construction of the buildings, and have them summarily torn down, with all the necessary loss and expense to him of such a course.”). For example, under the state common law doctrines of “vested rights” and “equitable estoppel,” state agencies are often 'precluded from nullifying investments made in reasonable reliance on a valid building or development permit. See 2 E. C. Yokley, Zoning Law and Practice § 14-5 (4th ed. 2009); see also, e.g., Avco Community Developers, Inc. v. South Coast Regional Commission, 17 Cal.3d 785, 132 Cal.Rptr. 386, 553 P.2d 546, 550 (1976) (“It has long been the rule in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit.”).
Here, the Section 404 permit afforded Mingo Logan 24 years to engage in an activity that was essential to the economic viability of its coal mining operation. After obtaining its permit in 2007, Mingo Logan spent millions of dollars preparing the site for mining operations. Mingo Logan’s large expenditures easily qualify as “serious reliance” upon the permit. Fox, 556 U.S. at 515, 129 S.Ct. 1800. And those investments have been rendered all but worthless by EPA’s 2011 decision to revoke the permit.
Under, Fox, because EPA’s change affected “serious reliance interests,” EPA needed to provide a “more detailed justification” for its revocation of Mingo Logan’s permit. Id. And because EPA was revoking a Section 404 permit, EPA’s more detailed justification needed to explain why the benefits of revoking Mingo Logan’s permit outweighed all of the relevant costs, including the significant cost of frustrating Mingo Logan’s investment-backed reliance on a government-issued permit. As already discussed, however, EPA did not even acknowledge the costs of revoking Mingo Logan’s permit, much less provide the more detailed justification for revoking the permit'that is required by Fox.[2]
II
To sum up: An agency must consider both costs and benefits of a proposed agency action unless Congress has barred consideration of costs. When an agency changes course by revoking a permit, one cost is the frustration of reliance interests. When reliance interests are frustrated in that way, the agency must not only consider that cost but must also provide a “more detailed justification” for its action revoking the permit. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). That more detailed justification must consider all of the relevant costs, including the frustration of reliance interests. In this case, EPA *738 utterly failed to meet those basic Administrative Procedure Act requirements.
How does the majority opinion deal with EPA’s failure to consider costs? The majority opinion does not address the issue. Rather, the majority opinion concludes that Mingo Logan forfeited the argument that EPA had to consider and justify the costs of revoking the permit. I disagree.
To preserve an issue, a party challenging an agency action arising in an administrative adjudication such as this ordinarily must raise the issue before the agency and, if applicable, before the district court. See Shea v. Kerry, 796 F.3d 42, 56 (D.C. Cir. 2015); Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Administration, 429 F.3d 1136, 1148 (D.C. Cir. 2005). The majority opinion says that Mingo Logan failed to raise its argument about the costs of revocation before EPA and again before the district court. But in my view, Mingo Logan raised its costs argument in both proceedings.
First, during the EPA proceeding, Min-go Logan informed EPA that the agency should consider the costs of the proposed permit revocation, not just the benefits. In its written comments to EPA, Mingo Logan argued that Section 404(c) of the Clean Water Act requires EPA to consider all the costs of revoking a permit: “ ‘Unacceptable,’ like ‘significant,’ is a relative term that must be weighed against the endangerment of the species, the size of the project, and any economic benefit from the project.” Mingo Logan, Comments in Response and in Opposition to the Recommended Determination of the U.S. Environmental Protection Agency Region III 6 n.11 (Nov. 29, 2010) (emphasis added), at Joint Appendix 712.
Indeed, it is self-evident that Mingo Logan raised a costs argument because EPA itself responded to Mingo Logan’s costs argument, stating: “[Mingo Logan’s] contention that the word ‘unacceptable’ ‘must be weighed against the endangerment of the species, the size of the project, and any economic benefit from the project’ is without merit.” EPA, Final Determination of the U.S. Environmental Protection Agency Pursuant to § 404(c) of the Clean Water Act Concerning the Spruce No. 1 Mine, Logan County, West Virginia app. 6 (Jan. 13, 2011) (hereinafter EPA Final Determination), at Joint Appendix 955.
Moreover, Mingo Logan specifically informed EPA of the costs it had incurred— namely, the significant investments that the Company had made in reliance on the permit: “After receiving its Section 404 permit, Mingo Logan spent millions of dollars preparing the Spruce No. 1 site and commencing its operations.” Mingo Logan, Comments in Response and in Opposition to the Proposed Determination 33 (June 3, 2010), at Joint Appendix 403. Mingo Logan added: “Now, more than three years after the issuance of the permit, as Mingo Logan is actively mining the site in an attempt to recoup its decade-long investment, EPA has declared that the impacts that it had approved are now unacceptable, and seeks to revoke the permit.” Mingo Logan, Comments in Response and in Opposition to the Recommended Determination of the U.S. Environmental Protection Agency Region III 2 (Nov. 29, 2010), at Joint Appendix 708.
Mingo Logan explained, in addition, that EPA must provide a more detailed justification for revoking a Section 404 permit: Mingo Logan stressed that while “the 404(c) standard pre-permit is high; the standard post-permit is even higher.” Mingo Logan, Comments in Response and in Opposition to the Recommended Determination of the U.S. Environmental Protection Agency Region III 8 (Nov. 29, 2010), at Joint Appendix 714.
*739 Taken together, Mingo Logan’s allegations were “made with sufficient specificity reasonably to alert” EPA that it had to consider and justify the costs of revoking the permit. Appalachian Power Co. v. EPA, 251 F.3d 1026, 1036 (D.C. Cir. 2001).
Second, before the District Court, Mingo Logan continued to press the same claim that it had made before EPA. Mingo Logan again discussed the “millions of dollars” the Company had spent preparing the mining site for operations. Amended Complaint at 19, Mingo Logan Coal Co. v. EPA, No. 10-541 (D.D.C. Feb. 28, 2011), at Joint Appendix 68. And Mingo Logan maintained that “long-settled legal principles” required EPA “to explain a change in course” in order to account for the “investment-chilling • prospect of post-permit action.” Supplemental Brief in Support of Mingo Logan’s Motion for Summary Judgment and in Opposition to EPA’s Motion for Summary Judgment at 9, Mingo Logan Coal Co. v. EPA, No. 10-541 (D.D.C. May 28, 2014). Mingo Logan continued to press that point in a hearing before the District Court: “[I]t is a fundamental precept of administrative law that an agency can’t just change its mind without any reason. We’ve cited several cases in our brief. There’s the [State Farm] case, the [.Jicarilla] case, that if an agency changes its position it has to articulate a reason for the change. That’s a fundamental precept of administrative law for any change.” Tr. of Motion Hearing at 9, Mingo Logan Coal Co. v. EPA, No. 10-541 (D.D.C. July 30, 2014). Mingo Logan therefore raised its costs argument before the District Court.
Put simply, Mingo Logan made both a State Farm argument and a Fox argument. The State Farm argument was that EPA had to consider all of the relevant factors, one of which was costs. The Fox argument was that the agency had to provide a more detailed justification because it was changing course and revoking a previously issued permit. As a matter of common sense and settled law, those arguments required EPA to consider not just the. benefits of revoking the permit, but also the costs. How else could EPA perform its duty under State Farm and Fox without considering the downside costs as well as the upside benefits of revoking the permit? See Michigan v. EPA, — U.S. -, 135 S.Ct. 2699, 2707, 192 L.Ed.2d 674 (2015) (“Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.”).
The majority opinion concludes that Mingo Logan forfeited its costs argument for two distinct reasons.
First, the majority opinion says that Mingo Logan failed to make a costs argument at all. But the majority opinion acknowledges, as it must, that Mingo Logan preserved the argument that “EPA is subject to a heightened standard to justify its withdrawal decision.” Maj. Op. at 723. The majority opinion nonetheless says that “Mingo Logan’s post-permit heightened-standard claim does not preserve its reliance-costs claim.” Id. at 723.
That makes little sense to me. Those are one and the same argument. After all, EPA must provide a more detailed justification post-permit, as the Supreme Court has carefully explained many times, precisely because a revocation (that is, a change in position) frustrates reliance interests. See Fox, 556 U.S. at 515, 129 S.Ct. 1800. So when Mingo Logan argued that EPA had to provide a more detailed justification for its revocation decision — an argument that the majority concedes Mingo Logan has preserved — Mingo Logan necessarily made the lesser-included argument that EPA had to consider costs. Again, the agency could not perform its *740 duty under State Farm or Fox without considering costs.
To illustrate the point, assume that when EPA decided not to veto the permit, EPA believed that the loss of one coal miner’s future job was a tolerable cost so long as two salamanders were saved. Once the permit was issued, the coal miner was hired and investments were made in the mining operation. So when EPA decided to revoke the permit, EPA had to explain how its calculus changed given that its revocation decision would cause the loss of existing jobs — not just hypothetical future ones — and existing investments. That’s what providing a “more detailed justification” entails in this context. Fox, 556 U.S. at 515, 129 S.Ct. 1800. EPA could not rationally provide a more detailed justification in this case without considering costs. Therefore, Mingo Logan necessarily made a costs argument when it asked EPA to provide a more detailed justification for its revocation decision.
Second and alternatively, the majority opinion suggests that even if Mingo Logan did raise an argument about costs, Mingo Logan “failed to detail” its reliance costs. Maj. Op. at 723. In the end, this seems to be the crux of the majority opinion’s objection. To begin with, even on its own terms, that objection fails. Mingo Logan told the agency that it had spent “millions of dollars” in reliance on the permit. That is at least $2 million. Moreover, EPA knew that the costs of revocation to Mingo Logan were significant. After all, in its decision revoking the permit, EPA itself “reeog-nize[d] that Mingo Logan has made significant investments in planning for operations at the Spruce No. 1 Mine.” EPA Final Determination at app. 6, at Joint Appendix 1236. At that time, EPA further noted that the “Spruce No. T Mine ... is one of the largest mountaintop mining projects ever authorized in West Virginia.” Id. at 15, at Joint Appendix 806. EPA should have weighed the costs of revocation in the balance. It did not do so.
There is also a far more fundamental problem with the majority opinion’s argument that Mingo Logan failed to detail its costs. EPA’s legal theory throughout these proceedings has been that costs are irrelevant to permit revocation decisions. Yet now EPA is faulting Mingo Logan for not adequately detailing its costs to the agency. That’s a bit rich. It is not as if EPA said it would consider costs and then Min-go Logan failed to present evidence. Rather, as reflected in its decision revoking the permit, EPA made clear that costs were irrelevant and said it would make its decision based solely on the adverse effect on animals. See id. at app. 6, at Joint Appendix 955. It flatly violates SEC v. Chenery for EPA now to rely on Mingo Logan’s supposed failure to detail its costs when EPA (over Mingo Logan’s objection) said at the agency stage and in the District Court that costs were irrelevant. See SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947). The forfeiture argument advanced by EPA (and accepted by the majority opinion) about Mingo Logan’s supposed failure to detail costs is entirely unfair to Mingo Logan. I would not countenance this kind • of agency bait and switch.
To be clear, the question whether Mingo Logan failed to adequately detail its costs is distinct from the question whether, in the first place, Mingo Logan sufficiently raised an argument that EPA needed to consider costs. Mingo Logan clearly raised a costs argument as part of its State Farm/Fox argument. If EPA thought that Mingo Logan failed to adequately support its costs estimate as an evidentiary matter, perhaps that could have been a basis for *741 EPA to conclude that the benefits of revocation outweighed the apparent costs of revoking the permit. But EPA never said any such thing. EPA did not engage in cost-benefit balancing at all. EPA said costs were irrelevant.
In short, Mingo Logan argued to both EPA and the District Court that EPA had to consider all of the relevant factors (State Farm) and provide a more detailed justification because it was changing position and revoking a permit on which Mingo Logan had relied (Fox). Mingo Logan preserved the argument that EPA had to consider costs, including reliance costs.
The Corps issued a 24-year permit to Mingo Logan, but EPA then revoked the permit four years later. In revoking the permit, EPA considered the benefits to animals, but none of the costs to humans. Because that cost-blind approach does not satisfy EPA’s duty of reasoned decision-making, and because Mingo Logan adequately raised that issue, I would direct the District Court to vacate EPA’s revocation decision and to remand to EPA for the agency to consider the benefits and costs of its proposed revocation, and to supply a “more detailed justification” for revoking the permit. Fox, 556 U.S. at 515, 129 S.Ct. 1800.1 I respectfully dissent.

. To be clear, even if an agency were not required to consider costs in making an initial decision, Fox would require the agency to consider réliance costs (if any) if and when the agency later changed course.