# Third District Court of Appeal

## State of Florida

Opinion filed January 25, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-1190
Lower Tribunal No. 13-2334
_____

## Diana R. Pedraza,
Appellant,

vs.

## Reemployment Assistance Appeals Commission, etc., et al.,
Appellees.

An Appeal from the Reemployment Assistance Appeals Commission.

Diana R. Pedraza, in proper person.

Louis A. Gutierrez (Tallahassee), Senior Attorney, for appellee Reemployment Assistance Appeals Commission.

Before LAGOA and FERNANDEZ, JJ., and SHEPHERD, Senior Judge.

FERNANDEZ, J.

This is an administrative appeal of an order from the Reemployment Assistance Appeals Commission ("Commission") that affirmed a decision of a reemployment assistance appeals referee who held that Diana R. Pedraza was

ineligible to receive reemployment assistance benefits because she did not qualify for Trade Readjustment Assistance ("TRA") program under the Trade Act of 1974. We reverse.

The TRA program provides monetary assistance to workers who are adversely affected by foreign trade competition. To determine whether a worker is eligible under the TRA program, the worker's annual wages at his or her current employment must be less than the annual wages from the former trade-affected employment and is calculated based upon the federal guidelines outlined in the Training and Employment Guidance Letter (TEGL) No. 22-08.

The federal guidelines state that the annual wages at separation from the trade affected employment are computed by multiplying the worker's hourly rate received during the last full week of his or her employment by the number of hours the individual worked during the *last full week of employment* and multiplying that number by 52. Annualized wages at reemployment are defined similarly to annualized wages at separation, except that the hourly rate and hours worked must reflect those of the first full week of reemployment. Based upon this calculation method, the Commission found that Pedraza was not eligible to receive benefits under the TRA program because her annual wages at her current employment were higher than her annual wages from the previous trade-affected employment.

Pedraza worked for Boston Scientific Corporation ("Boston Scientific") for

seven years until her employment ended on September of 2011, as a result of foreign trade competition. Pedraza's pay rate at Boston Scientific was $11.74 per hour. Pedraza was subsequently employed by Aveva in December of 2012 and her pay rate was $9.50 per hour.

Boston Scientific compensated Pedraza on a bi-weekly schedule. Pedraza's last pay period for Boston Scientific was September 25, 2011. The last pay stub showed that Pedraza worked an average of nineteen and one-quarter hours per week during the last two weeks. The second to last pay period, which ended on September 11, 2011, showed that Pedraza worked seventy-two hours for two weeks. Pedraza claimed that she normally worked forty hours per week, which is evident in the first week of the September 11, 2011 pay period. But because the last week of the September 11, 2011 pay period included the Labor Day holiday, she worked only 32 hours that week.

The Commission calculated Pedraza's yearly income from Boston Scientific by going back to the second week of the September 11, 2011 pay period. During that week, Pedraza worked thirty-two hours instead of her normal forty hours due to the Labor Day holiday. The Commission multiplied Pedraza's wage of $11.74 per hour by thirty-two hours, equaling $375.68 per week. The Commission then multiplied $375.68 by fifty-two, which resulted in a net income of $19,535.36 per year from Boston Scientific.

3

The Commission next calculated Pedraza's yearly income from Aveva by looking at her first full week of employment. Pedraza worked forty hours during that week. The Commission multiplied Pedraza's wage by forty, equaling $380 per week. The Commission then multiplied $380 by fifty-two, which resulted in a net income of $19,760 per year from Aveva. Based on these calculations, the Commission found that Pedraza was not entitled to benefits under the TRA program because her income at Aveva was higher than her income from Boston Scientific.

When calculating Pedraza's income at Boston Scientific, the Commission should have looked at the first week of the September 11, 2011 pay period. Had the Commission done so, it would have accurately calculated her annual net income based on a forty hour work week, which was her normal work schedule at Boston Scientific. Pedraza's forty hour weekly income of $469.60 would have been multiplied by fifty-two, resulting in an average yearly income of $24,419.20 at Boston Scientific. Based on these calculations, it is apparent that Pedraza was entitled to benefits under the TRA program because she was now earning less at Aveva than when she worked at Boston Scientific, as her yearly income was reduced by $4,659.20.

The Commission denied Pedreza the financial benefits because it incorrectly based its calculations on Pedraza's last full week at Boston Scientific on a week

4

when there was a national holiday. The Commission mistakenly interpreted the phrase "last full week of employment" as set out in the federal guidelines to mean the last week Pedraza worked full time. The Commission relied on Florida law to define full time employment as 32 hours or more per week.

We acknowledge that an agency's interpretation of a statute, with which it is legislatively charged with administering, shall be accorded great weight and should not be overturned unless clearly erroneous, arbitrary, or unreasonable. Guido v. Vincam Human Resources, Inc., 729 So. 2d 968, 969 (Fla. 3d DCA 1999). As such, we find that the Commission's interpretation of what is the "last full week of employment" for purposes of determining a worker's eligibility to receive TRA benefits was clearly erroneous. See Weiser v. Unemployment Appeals Comm'n, 406 So. 2d 1200, 1201 (Fla. 4th DCA 1981)(ruling that the Commission's construction of the phrase "26 weeks of employment" was flawed, and the worker was entitled to financial assistance under the TRA program).

The phrase "last full week of employment" should not be read as the last week an employee works full time as defined by Florida law. The phrase "last full week of employment" should be decided on a case-by-case analysis to determine how much the applicant normally worked while employed with the subject company. Thus, her last full week of employment at Boston Scientific was not the last week she worked full time, but rather it is the last week Pedraza worked her

5

normal schedule. Pedraza worked for Boston Scientific for seven years at an average of forty hours a week. It was clearly erroneous for the Commission to calculate Pedraza's last full week of employment in a week when there was a Labor Day holiday in which she was not required to work. We therefore reverse the decision of the Reemployment Assistance Appeals Commission because it was clearly erroneous and order that Pedraza receive benefits in accordance with her decrease in income in conformity with this opinion.

Reversed and remanded for further proceedings consistent with this opinion.

LAGOA, J., concurs.

SHEPHERD, Senior Judge, concurring in result.

I concur in the result in this case. I write only to rail once again, as I have on more than one prior occasion—most recently, in <u>Housing Opportunities Project, etc. et al, v. SPV Realty, LC</u>, 42 Fla. L. Weekly D44a (Fla. 3d DCA Dec. 21, 2016)—that this Court should seriously consider the constitutional implications of blindly adhering to the mantra so regularly incanted by the Court to support, uphold, or approve agency decision-making that "an agency's interpretation of a statute, with which it is entitled with administering shall be accorded great weight and should not be overturned unless clearly erroneous, arbitrary, or unreasonable,"[1] as well as the many variations on the theme.

As Justice Thomas recently explained in the context of federal legislation where the same legal line is often reflexively, I would say mindlessly, invoked to approve agency interpretation of congressional legislation, <u>Chevron</u> deference "wrests from Courts the ultimate interpretative authority to 'say what the law is,' <u>Marbury v. Madison</u>, 1 Cranch 137, 177, 2 L.Ed. 60 (1803)[2], and hands it over to

---

[1] Majority op. at 5.

[2] <u>See</u> Cass R. Sunstein, <u>Chevron Step Zero</u>, 92 Va. L. Rev. 187, 188-89 (2006) ("Ironically, Justice Stevens, the author of Chevron, had no broad ambitions for the decision; the Court did not mean to do anything dramatic. But shortly after it appeared, Chevron was quickly taken to establish a new approach to judicial review of agency interpretations of law, going so far as to create a kind of counter-

the Executive." <u>Michigan v. E.P.A.</u>, 135 S. Ct. 2699, 2712 (2015) (Thomas, J., concurring);[3] <u>cf.</u> <u>Bush v. Schiavo</u>, 885 So. 2d 321, 330 (Fla. 2004) ("Under the express separation of powers provision in our state constitution, 'the judiciary is a <u>coequal branch of the Florida government vested with the sole authority to exercise</u>

Marbury for the administrative state. Chevron seemed to declare that in the face of ambiguity, it is emphatically the province and duty of the administrative department to say what the law is." (footnotes omitted)).

[3] <u>See also</u> Antonin Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L.J. 511, 513-14 (1989):

> It is not immediately apparent why a court should ever accept the judgment of an executive agency on a question of law. Indeed, on its face the suggestion seems quite incompatible with Marshall's aphorism that "[i]t is emphatically the province and duty of the judicial department to say what the law is." Surely the law, that immutable product of Congress, is what it is, and its content—ultimately to be decided by the courts—cannot be altered or affected by what the Executive thinks about it. I suppose it is harmless enough to speak about "giving deference to the views of the Executive" concerning the meaning of a statute, just as we speak of "giving deference to the views of the Congress" concerning the constitutionality of particular legislation—the mealy-mouthed word "deference" not necessarily meaning anything more than considering those views with attentiveness and profound respect, before we reject them. But to say that those views, if at least reasonable, will ever be *binding*—that is, seemingly, a striking abdication of judicial responsibility.

(footnote omitted). Justice Scalia ultimately concludes, however, that agency deference is theoretically justified as a function of Congress's intent to confer discretion upon the agency. <u>Id</u>. at 516. <u>But see</u> Philip Hamburger, <u>Chevron Bias</u>, 84 Geo. Wash. L. Rev. 1187, 1196 n.28 (2016) ("Certainly, it often is said that Congress delegates judicial power to agencies, but this cannot be delegation, for the Constitution places the judicial power in the courts, and Congress cannot subdelegate a power it does not have. U.S. Const. art. III, § 1.").

the judicial power[.]'"); Fla. Code of Jud. Conduct, Canon 1 ("A Judge Shall Uphold the Integrity and Independence of the Judiciary.").

Perhaps even more profound, is the due process problem of automatically taking the side of one of the parties in the case. As one percipient scholar has explained:

> It ordinarily would be outrageous for a judge in a case to defer to the views of one of the parties. And it ordinarily would be inconceivable for judges to do this regularly by announcing ahead of time a rule under which judges should defer to the interpretation of one of the parties in their cases, let alone the most powerful of parties, the government. Nonetheless, this is what the judges have done. It therefore is necessary to confront the reality that when judges defer to the executive's view of the law, they display systematic bias toward one of the parties.

Hamburger, supra note 2, at 1212; see also Fla. Code of Jud. Conduct, Canon 3 ("A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently.").

In my view, deference to an agency's construction or application of a statute implicates important due process and separation of powers questions deserving of serious contemplation by future members of this and other courts around the state. The fundamental concern of keeping the individual branches separate is that the fusion of the powers of any two branches into the same department would ultimately result in the destruction of liberty. E.g., Ponder v. Graham, 4 Fla. 23, 42-43 (1851); The Federalist Nos. 47, 51 (James Madison). We should be

reluctant to so readily abandon our judicial independence and alter the structure upon which our entire system of government is based. Moreover, we should not be so quick to embrace a course of conduct that results in systemic bias towards one of the parties. While I recognize the reality of agency deference, I share Justice Thomas's concern that "we seem to be straying further and further from the Constitution without so much as pausing to ask why. We should stop and consider that document before blithely giving the force of law to any other agency 'interpretations[.]'" Michigan, 135 S. Ct. at 2713.