# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 15, 2019          Decided August 9, 2019

No. 18-1129

UNITED KEETOOWAH BAND OF CHEROKEE INDIANS IN
OKLAHOMA, INDIVIDUALLY AND ON BEHALF OF ALL OTHER
NATIVE AMERICAN INDIAN TRIBES AND TRIBAL
ORGANIZATIONS, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

NATIONAL ASSOCIATION OF TRIBAL HISTORIC PRESERVATION
OFFICERS, ET AL.,
INTERVENORS

———

Consolidated with 18-1135, 18-1148, 18-1159, 18-1184

———

On Petitions for Review of an Order of
the Federal Communications Commission

———

*Stephen Díaz Gavin* argued the cause for petitioners
United Keetoowah Band of Cherokee Indians in Oklahoma, et
al., and supporting intervenors. With him on the briefs were *J.
Scott Sypolt*, *Joel D. Bertocchi*, *Joseph H. Webster*, *F. Michael*

*Willis*, *Andrew Jay Schwartzman*, *James T. Graves*, and *Elizabeth S. Merritt*. *Angela J. Campbell* entered an appearance.

*Sharon Buccino* argued the cause for petitioner Natural Resources Defense Council and intervenor Edward B. Myers. With her on the briefs was *Edward B. Myers*.

*Natalie A. Landreth* argued the cause for petitioners Blackfeet Tribe, et al. With her on the briefs were *Wesley J. Furlong*, *Joel West Williams*, *Troy A. Eid*, *Jennifer H. Weddle*, and *Heather D. Thompson*.

*Jacob M. Lewis*, Associate General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, U.S. Department of Justice, *Eric A. Grant*, Deputy Assistant Attorney General, *Andrew C. Mergen* and *Allen M. Brabender*, Attorneys, *Thomas M. Johnson Jr.*, General Counsel, Federal Communications Commission, *David M. Gossett*, Deputy General Counsel, and *C. Grey Pash Jr.*, Counsel. *Jonathan H. Laskin* and *Robert B. Nicholson*, Attorneys, U.S. Department of Justice, and *Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, entered appearances.

*Joshua Turner* argued the cause for intervenors in support of respondents. With him on the brief were *Christopher J. Wright* and *E. Austin Bonner*.

Before: TATEL and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Cellular wireless services, including telephone and other forms of wireless data transmission, depend on facilities that transmit their radio signals on bands of electromagnetic spectrum. The Federal Communications Commission (FCC or Commission) has exclusive control over the spectrum, and wireless providers must obtain licenses from the FCC to transmit. Wireless service in the United States has mostly depended on large, "macrocell" radio towers to transmit cell signal, but companies offering the next generation of wireless service—known as 5G—are in the process of shifting to transmission via hundreds of thousands of densely spaced small wireless facilities, or "small cells." As part of an effort to expedite the rollout of 5G service, the Commission has removed some regulatory requirements for the construction of wireless facilities. These petitions challenge one of the FCC's orders paring back such regulations, *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment (Second Report & Order)* (*Order*), FCC 18-30, 2018 WL 1559856 (F.C.C.) (Mar. 30, 2018).

The *Order* exempted most small cell construction from two kinds of previously required review: historic-preservation review under the National Historic Preservation Act (NHPA) and environmental review under the National Environmental Policy Act (NEPA). Together, these reviews assess the effects of new construction on, among other things, sites of religious and cultural importance to federally recognized Indian Tribes. The *Order* also effectively reduced Tribes' role in reviewing proposed construction of macrocell towers and other wireless facilities that remain subject to cultural and environmental review.

Three groups of petitioners challenge the *Order* as violating the NHPA, NEPA, and the Administrative Procedure

Act on several grounds: that its elimination of historic-preservation and environmental review of small cell construction was arbitrary and capricious, an unjustified policy reversal, and contrary to the NHPA and NEPA; that the changes to Tribes' role in reviewing new construction was arbitrary and capricious; that the Commission arbitrarily and capriciously failed to engage in meaningful consultations with Tribes in promulgating the *Order*; and that the *Order* itself required NEPA review.

We grant in part the petitions for review because the *Order* does not justify the Commission's determination that it was not in the public interest to require review of small cell deployments. In particular, the Commission failed to justify its confidence that small cell deployments pose little to no cognizable religious, cultural, or environmental risk, particularly given the vast number of proposed deployments and the reality that the *Order* will principally affect small cells that require new construction. The Commission accordingly did not, pursuant to its public interest authority, 47 U.S.C. § 319(d), adequately address possible harms of deregulation and benefits of environmental and historic-preservation review. The *Order*'s deregulation of small cells is thus arbitrary and capricious. We do not reach the alternative objections to the elimination of review on small cell construction. We deny the petitions for review on the remaining grounds.

## BACKGROUND

### I. Statutory and Regulatory Background

### A. National Historic Preservation Act (NHPA)

Congress enacted the NHPA to "foster conditions under which our modern society and our historic property can exist

in productive harmony" and "contribute to the preservation of nonfederally owned historic property and give maximum encouragement to organizations and individuals undertaking preservation by private means." 54 U.S.C. § 300101(1), (4). As part of that mission, NHPA's Section 106 requires federal agencies to "take into account the effect of" their "undertaking[s] on any historic property." *Id.* § 306108.

Both "historic property" and "undertaking" have specific meanings under the statute. Historic properties include myriad monuments, buildings, and sites of historic importance, including "[p]roperty of traditional religious and cultural importance to an Indian tribe." *Id.* §§ 302706, 300308. Insofar as Tribal heritage is concerned, the Section 106 process requires federal agencies to "consult with any Indian tribe . . . that attaches religious and cultural significance to" a historic property potentially affected by a federal undertaking. *Id.* §§ 302706, 306102. To count as "historic," such properties need not be on Tribal land; in fact, they "are commonly located outside Tribal lands and may include Tribal burial grounds, land vistas, and other sites that Tribal Nations . . . regard as sacred or otherwise culturally significant." *Order* ¶ 97. Only a federal "undertaking," not a state or purely private one, triggers the Section 106 Tribal consultation process. A federal "undertaking," as relevant here, is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit, license, or approval." 54 U.S.C. § 300320. We have construed the statute to mean that, for an action to be a federal undertaking, "only a 'Federal permit, license or approval' is required," not necessarily federal funding. *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 112 (D.C. Cir. 2006).

The Section 106 process requires that an agency "consider the impacts of its undertaking" and consult various parties, not

that it necessarily "engage in any particular preservation activities." *Id.* at 107 (quoting *Davis v. Latschar*, 202 F.3d 359, 370 (D.C. Cir. 2000)).  The NHPA established an independent agency, the Advisory Council on Historic Preservation (Advisory Council), 54 U.S.C. § 304101, which is responsible for promulgating regulations "to govern the implementation of" Section 106, *id.* § 304108(a).  Agencies must consult with the Advisory Council, State Historic Preservation Officers, and Tribal Historic Preservation Officers, the last of which adopt the responsibilities of State Historic Preservation Officers on Tribal lands.  54 U.S.C. §§ 302303, 302702; 36 C.F.R. §§ 800.3(c), 800.16(v)-(w) (defining State and Tribal Historic Preservation Officers).

The Advisory Council's regulations authorize the use of alternatives to the ordinary Section 106 procedures, called "programmatic agreements."  36 C.F.R. § 800.14(b).  The Commission develops programmatic agreements in consultation with the Advisory Council, Tribes, and other interested parties, "to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings" in certain circumstances, such as when "effects on historic properties are similar and repetitive" or "effects on historic properties cannot be fully determined prior to approval of an undertaking."  *Id.* § 800.14(1)(i)-(ii).  Tribes' views must be taken into account where the agreement "has the potential to affect historic properties on tribal lands or historic properties of religious and cultural significance to an Indian tribe."  *Id.* § 800.14(b)(1)(i), (f).  For instance, the Commission has consulted with Tribes to use programmatic agreements to exclude from individualized review entire categories of undertakings that are unlikely to affect historic properties. *See In re Nationwide Programmatic Agreement Regarding the Section 106 [NHPA] Review Process* (*Section 106 Agreement*), 20 FCC Rcd. 1073, 1075 ¶ 2 (2004).

**B. National Environmental Policy Act (NEPA)**

Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment" and "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man," among other purposes. 42 U.S.C. § 4321. Like the NHPA, NEPA mandates a review process that "does not dictate particular decisional outcomes, but 'merely prohibits uninformed—rather than unwise—agency action.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)).

All "major Federal actions significantly affecting the quality of the human environment" trigger environmental review under NEPA, just as federal "undertakings" trigger historic preservation review under the NHPA. 42 U.S.C. § 4332(C). Major federal actions "include[] actions . . . which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Under the Commission's procedures implementing NEPA, if an action may significantly affect the environment, applicants must conduct a preliminary Environmental Assessment to help the Commission determine whether "the proposal will have a significant environmental impact upon the quality of the human environment," and so perhaps necessitate a more detailed Environmental Impact Statement. 47 C.F.R. § 1.1308; *see also* 40 C.F.R. § 1508.9. If, after reviewing the Environmental Assessment, the Commission determines that the action will not have a significant environmental impact, it will make a "finding of no significant impact" and process the application "without further documentation of environmental effect." 47 C.F.R. § 1.1308(d).

NEPA also has an analogue to the NHPA's Advisory Council. In enacting NEPA, Congress established the Council on Environmental Quality, in the Executive Office of the President, to oversee implementation of NEPA across the entire federal government. 42 U.S.C. §§ 4342, 4344. With the endorsement of the Council on Environmental Quality and by following a series of mandated procedures, agencies can establish "categorical exclusions" for federal actions that require neither an Environmental Assessment nor an Environmental Impact Statement. 40 C.F.R. § 1508.4. Categorical exclusions are appropriate for "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency." *Id.* "Categorical exclusions are not exemptions or waivers of NEPA review; they are simply one type of NEPA review." Council on Environmental Quality, *Memorandum for Heads of Federal Dep'ts and Agencies: Establishing, Applying & Revising Categorical Exclusions under [NEPA]* (*Categorical Exclusion Memo*) 2 (2010).

## C. Legal Framework for Wireless Infrastructure

The Communications Act of 1934 established the FCC to make available a "rapid, efficient . . . wire and radio communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151. In licensing use of the spectrum, the Commission is tasked with promoting "the development and rapid deployment of new technologies, products and services for the benefit of the public . . . without administrative or judicial delays," *id.* § 309, and "maintain[ing] the control of the United States over all the channels of radio transmission," *id.* § 301.

The Commission generally does not require construction permits before private parties can build wireless facilities. Congress largely eliminated the FCC's site-specific construction permits in 1982, and the Commission has since required construction permits only where it finds that the public interest would be served by such permitting. *See* Pub. L. 97-259, 96 Stat. 1087, § 119 (1982) (codified at 47 U.S.C. § 319(d)). It has not made such a finding for the wireless facilities at issue here.

The FCC does, however, require licensing of the spectrum used by wireless small cells. It does so by issuing geographic area licenses, which allow wireless providers to operate on certain frequency bands in a wide geographic area. *See* 47 U.S.C. § 309(j). Those licenses authorize using spectrum rather than building wireless facilities, but they necessarily contemplate facility construction. They have coverage requirements—for instance, one type of geographic area license required licensees to provide service to at least 40% of the population in their geographic service area by June 2013. *See* 47 C.F.R. § 27.14(h). If they fail to meet the coverage requirements, they can be stripped of authority to operate for the license's full term or serve part of its geographic area, and they "may be subject to enforcement action, including forfeitures." *Id.* The Commission also exercises continuing authority to inspect radio installations to ascertain their compliance with any and all applicable laws, whether or not the licensee itself constructed those installations. *See* 47 U.S.C. § 303(n); 47 C.F.R. § 1.9020(c)(5).

The Commission has not identified any period since the enactment of the NHPA (in 1966) and NEPA (in 1970) when it did not require historic-preservation and environmental review of wireless facilities. After Congress eliminated the construction permit requirement, the Commission for a time

required NEPA and NHPA review of facilities before it granted their service licenses. *See, e.g.*, *In re Amendment of Envtl. Rules in Response to New Regulations Issued by [CEQ]*, FCC 85-626, 1986 WL 292182, at \*5 ¶ 18 (F.C.C.) (Mar. 26, 1986) (requiring review "during the period prior to grant of a station license"); *id.* at \*8 App'x ¶ 7 (requiring NEPA review on "[f]acilities that will affect districts, sites, buildings, structures or objects . . . that are listed in the National Register of Historic Places or are eligible for listing," which includes property of religious or cultural significance to Indian Tribes, 54 U.S.C. § 302706(a)). In 1990, the Commission shifted review from the licensing stage to the construction stage by establishing a "limited approval authority" over construction of wireless facilities. *In re Amendment of Envtl. Rules* (*1990 Order*), 5 FCC Rcd. 2942 (1990). Limited approval authority required that, "where construction of a Commission-regulated radio communications facility is permitted without prior Commission authorization (*i.e.*, without a construction permit), the licensee must nonetheless comply with historic preservation and environmental review procedures." *Order* ¶ 51; *see also* 47 C.F.R. § 1.1312. The authority was "limited" in that it allowed "the Commission [to] exercise[] control over deployment solely to conduct federal historic and environmental review." Resp't Br. 12. The Commission emphasized that shifting review to the pre-construction stage served a practical function: Before it had established its limited approval authority, the FCC's rules "provide[d] that any required submission of [Environmental Assessments] and any required Commission environmental review take place at the licensing stage rather than prior to construction," with the result that "[a]pplicants who ha[d] already constructed their facilities" could "subsequently be denied licenses on environmental grounds." *1990 Order* 2942 ¶ 3. The Commission explained that it continued to require review "to ensure that the Commission fully complies with Federal

environmental laws in connection with facilities that do not require pre-construction authorization." *Id.* ¶ 4. It announced the changes as "necessary to ensure that the Commission addresses environmental issues early enough in the licensing process to ensure that it fully meets its obligations under Federal environmental laws," including NEPA and the NHPA. *Id.* at 2943 ¶ 9 & n.16.

The Commission has never required individualized review of each separate facility, however. A long series of regulations, programmatic agreements, and categorical exclusions has aggregated facilities for joint consideration and focused NHPA and NEPA review on those deployments most likely to have cultural or environmental effects. For instance, most collocations—deployments on existing structures—are excluded from individualized review under NHPA programmatic agreements and NEPA categorical exclusions. *See In re Implementation of the National Environmental Policy Act of 1969* (*Implementation of NEPA*), 49 F.C.C.2d 1313, 1319-20 (1974); *Nationwide Programmatic Agreement for the Collocation of Wireless Antennas* (*Collocation Agreement*), 47 C.F.R. pt.1, app. B (2001); *Section 106 Agreement*, 20 FCC Rcd. at 1075 ¶ 2; *Nationwide Programmatic Agreement for Review Under the National Historic Preservation Act*, 70 Fed. Reg. 556 (2005); *In re Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies* (*Improving Wireless Facilities Siting Policies*), 29 FCC Rcd. 12865, 12870 ¶ 11 (2014); 47 C.F.R. § 1.1320(b)(4). Categorical exclusions go through notice and comment, 40 C.F.R. § 1507.3; include impact findings, *Categorical Exclusion Memo* 9; require the Council on Environmental Quality to approve them as consistent with its regulations and NEPA, 40 C.F.R. § 1507.3(a); and reserve rights to interested parties to request further review in the event that atypical adverse effects do occur, 47 C.F.R. § 1.1307(c), (d). At the same time, they

achieve enormous efficiencies in the review processes for classes of actions or undertakings anticipated to have minimal or no adverse cultural or environmental effects.

Since 2004, the FCC has been conducting NHPA review in accordance with a broad programmatic agreement, the *Section 106 Agreement*, 20 FCC Rcd. 1073. Interested parties developed that agreement to "tailor the Section 106 review in the communications context in order to improve compliance and streamline the review process for construction of towers and other Commission undertakings, while at the same time advancing and preserving the goal of the NHPA to protect historic properties, including historic properties to which federally recognized Indian tribes . . . attach religious and cultural significance." *Id.* at 1074-75 ¶ 1. In the *Section 106 Agreement*, the Commission adopted "procedures for participation of federally recognized Indian tribes," among other changes. *Id.* at 1075 ¶ 2. It also formalized the use of the electronic Tower Construction Notification System, which notifies Tribes of proposed wireless construction in areas they have identified as containing properties of religious and cultural significance, and allows them to give applicants information on the potential effects of proposed construction. *Id.* at 1106-10 ¶¶ 89-100.

## II. Order Under Review

The challenged *Order* eliminated NHPA and NEPA review on small cells that meet certain size and other specifications, based on the Commission's conclusion that such review was not statutorily required and would impede the advance of 5G networks, and that its costs outweighed any benefits. *See Order* ¶¶ 36-45. The *Order* also altered Tribal involvement in those Section 106 reviews that are still conducted on wireless facilities that were not encompassed in

the small cell exemption. *See id.* ¶¶ 96-130. Two of the five Commissioners dissented. *See Order*, Dissenting Statement of Comm'r Mignon L. Clyburn; Dissenting Statement of Comm'r Jessica Rosenworcel.

We consolidated five timely petitions for review of the *Order* into this action. They challenge the Commission's exclusion of small cell construction from NHPA and NEPA review, its changes to Tribal involvement in Section 106 review, and its promulgation of the *Order* itself. Three groups of petitioners and intervenors, each designated here by the name of its lead petitioner, challenge the *Order*. United Keetoowah Band of Cherokee Indians (Keetoowah) represents a group of Tribes and historic preservation organizations. Blackfeet Tribe (Blackfeet) represents another group of Tribes and the Native American Rights Fund. The Natural Resources Defense Council (NRDC) represents itself and Maryland citizen Edward B. Myers. Two wireless industry groups (jointly, CTIA) intervened to defend the order alongside the FCC.

**ANALYSIS**

We set aside an agency order only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agencies' obligation to engage in "reasoned decisionmaking" means that "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). Although "a court is not to substitute its judgment for that of the agency," the arbitrary and capricious standard demands that the agency "examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An agency action is arbitrary and capricious where the agency has "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

The FCC is entitled to deference to its reasonable interpretations of ambiguous provisions of the Communications Act. *See Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844-45 (1984). We owe no deference to the FCC's interpretations of the NHPA or NEPA, which are primarily administered by the Advisory Council, *see McMillan Park Comm. v. Nat'l Capital Planning Comm'n*, 968 F.2d 1283, 1287-88 (D.C. Cir. 1992), and the Council on Environmental Quality, *see Grand Canyon Tr. v. FAA*, 290 F.3d 339, 341 (D.C. Cir. 2002) (as amended Aug. 27, 2002), respectively.

## I.  Eliminating NHPA and NEPA Review on Small Cells

The *Order* did not follow the processes for a programmatic agreement under the NHPA, a categorical exclusion from NEPA, or any other wholesale or aggregated form of review, but simply eliminated NHPA and NEPA review on most small cells by removing them from the FCC's limited approval authority. Small cells had not previously been defined or regulated separately from macrocell towers. The Commission defines the small cells that its *Order* deregulates as wireless facilities that are not on Tribal lands, do not require antenna structure registration because they could not constitute a

menace to air navigation, do not result in human exposure to radiofrequency radiation in excess of applicable safety standards, and that are "small" per the following conditions:

> (i) The facilities are mounted on structures 50 feet or less in height including their antennas . . . or the facilities are mounted on structures no more than 10 percent taller than other adjacent structures, or the facilities do not extend existing structures on which they are located to a height of more than 50 feet or by more than 10 percent, whichever is greater;

> (ii) Each antenna associated with the deployment, excluding the associated equipment . . . is no more than three cubic feet in volume;

> (iii) All other wireless equipment associated with the structure, including the wireless equipment associated with the antenna and any pre-existing associated equipment on the structure, is no more than 28 cubic feet in volume.

47 C.F.R. § 1.1312(e)(2). Small cells that meet those requirements are now outside the purview of the Commission's limited approval authority, the mechanism by which it has required NHPA and NEPA review since 1990.

The Commission deregulated small cells as part of a broader effort to reduce regulations that the FCC says "are unnecessarily impeding deployment of wireless broadband networks" on which 5G service depends. *Order* ¶ 3. "Within the next few years," the Commission explained, "5G networks . . . will make possible once-unimaginable advances, such as

self-driving cars and growth of the Internet of Things," *i.e.* physical objects controllable over the internet. *Id.* ¶ 1. 5G networks "will increasingly need to rely on network densification," which entails "the deployment of far more numerous, smaller, lower-powered base stations or nodes that are much more densely spaced." *Id.* According to the Commission, rapid proliferation of hundreds of thousands of small cells would be hindered by the significant time and cost of NHPA and NEPA reviews, even as the benefits of such review—which it characterized as already minimal—would be negligible because small cells are "inherently unlikely to trigger environmental and historic preservation concerns." *Id.* ¶ 92; *see also id.* ¶¶ 9, 11-16. It noted that the FCC's baseline approach to environmental and historic-preservation review, which requires facility-specific review unless a programmatic agreement or categorical exclusion applies, "was developed when all or nearly all deployments involved large macrocell facilities and accordingly failed to consider both the relatively diminutive size of small wireless facilities and the proliferation of these facilities necessary for deployment of advanced wireless technologies." *Id.* ¶ 9.

In the *Order*, the Commission asserts that federal law does not independently require such review. The only basis for treating small cell construction as either a federal undertaking triggering NHPA review or a major federal action triggering NEPA review was, the Commission says, the limited approval authority the Commission exercised over that construction— which the *Order* eliminated. *See Order* ¶¶ 58-59. The Commission reasons that removing small cell construction from its limited approval authority removes the "sufficient degree of federal involvement" necessary to render an undertaking or action "federal." *Id.* ¶ 58. It now says its power to exercise limited approval authority over construction derives exclusively from its "public interest authority" under the

Communications Act, *see Order* ¶¶ 39, 53, 61, rather than from "its obligations under Federal environmental laws," *1990 Order* at 2943 ¶ 9. In this context, the "public interest authority" refers to the FCC's power to require pre-construction permits for wireless facilities if it "determines that the public interest, convenience, and necessity would be served by requiring such permits." 47 U.S.C. § 319(d). While the Commission has never made such a determination for the category of facilities at issue here, it has previously interpreted the public interest authority "as allowing the Commission to require covered entities [not requiring preconstruction permits] to nonetheless comply with environmental and historic preservation processing requirements." *Order* ¶ 53. In the *Order*, the Commission made a new determination that it was not in the public interest to require NHPA and NEPA review on small cells, so simply removed them from its limited approval authority.

Petitioners all argue that the FCC unlawfully excluded small cells from NHPA and NEPA review. They contend first that removing small cells from the FCC's limited approval authority was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Keetoowah and the NRDC argue that the Commission failed to adequately consider the harms of massive deployment and to justify its decision to completely exempt small cells from review. Additionally, all petitioners argue that the NHPA and NEPA mandate review of small cell construction. They assert that the geographic licenses the Commission grants, which allow wireless companies to operate on spectrum, constitute sufficient federal control over wireless facility construction to make the construction a federal undertaking and a major federal action triggering review under those statutes. Keetoowah also contends that the exclusion violates the Administrative Procedure Act on various other grounds, including that it is an unjustified policy reversal. If

petitioners prevail on any one or more of those grounds, we must vacate the *Order*'s deregulation of small cells and remand to the FCC.

The Commission failed to justify its determination that it is not in the public interest to require review of small cell deployments. We therefore grant the petitions in part because the *Order*'s deregulation of small cells is arbitrary and capricious. The Commission did not adequately address the harms of deregulation or justify its portrayal of those harms as negligible. In light of its mischaracterization of small cells' footprint, the scale of the deployment it anticipates, the many expedients already in place for low-impact wireless construction, and the Commission's decades-long history of carefully tailored review, the FCC's characterization of the *Order* as consistent with its longstanding policy was not "logical and rational." *Michigan v. EPA*, 135 S. Ct. at 2706. Finally, the Commission did not satisfactorily consider the benefits of review.

*First*, the Commission inadequately justified its portrayal of deregulation's harms as negligible. The FCC partly based its public-interest conclusion on a picture of small cells that the record does not support. It described small cells as "materially different from the deployment of macrocells in terms of . . . the lower likelihood of impact on surrounding areas." *Order* ¶ 41. In its brief, the Commission sums up its explanation of the difference: "small cells are primarily pizza-box sized, lower-powered antennas that can be placed on existing structures." Resp't Br. 3; *see also Order* ¶¶ 66, 92. It likened small cells to small household items that operate on radiofrequency such as "consumer signal boosters [and] Wi-Fi routers," which do not undergo review. *Order* ¶ 66. Small cells are, to be sure, quite different from macrocells in many ways, but the Commission fails to address that small cells are typically *mounted* on much

bigger structures, and the *Order* is not limited to deployments on structures that already exist or are independently subject to review. Small cells deregulated under the *Order* can be "mounted on structures 50 feet or less in height including their antennas" or "mounted on structures no more than 10 percent taller than other adjacent structures." 47 C.F.R. § 1.1312(e)(i). That makes them crucially different from the consumer signal boosters and Wi-Fi routers to which the FCC compares them.

The scale of the deployment the FCC seeks to facilitate, particularly given its exemption of small cells that require new construction, makes it impossible on this record to credit the claim that small cell deregulation will "leave little to no environmental footprint." *Order* ¶ 41. The Commission anticipates that the needed "densification of small deployments over large geographic areas," *id.*, could require 800,000 deployments by 2026, FCC, *Declaratory Ruling & Third Report & Order*, FCC 18-133 ¶ 126 (Sept. 26, 2018). Even if only twenty percent of small cells required new construction— as one wireless company estimates and the FCC highlights in its brief, *see* Resp't Br. 54—that could entail as many as 160,000 densely spaced 50-foot towers (or 198-foot towers, as long as they are located near 180-foot adjacent structures). The Commission does not grapple with that possibility. Instead, it highlights the small cells that can be collocated without addressing the many thousands that cannot be.

As Keetoowah points out, the FCC "offers no analysis of the footprint of" the new towers on which small cells can be mounted, "what equipment will be used, what ongoing maintenance or security will be provided and how often towers will be updated or rebuilt." Keetoowah Br. 15-16. Deployment of new small cells requires not only new construction but also wired infrastructure, such as electricity hookups, communications cables, and wired "backhaul,"

which connects the new antenna to the core network. *See, e.g.*, *Comment of Sprint*, Joint Appendix (J.A.) 380 (describing process of deploying small cells); *Comment of the Cities of Bos., Mass., et al.*, J.A. 705-06 (describing the equipment associated with small cells), NRDC Br. Ex. A, Decl. of Warren Betts ¶¶ 11-12 (describing concerns about disruption "by the laying of cables and wires, by the maintenance they require, [and] by the sound of the maintenance vehicles" in otherwise tranquil areas, and concerns "that trees may be cut down or damaged by the construction of small cells"). Construction, connection, and maintenance may entail excavation and clearing of land. The Tribal Historic Preservation Officer for the Seminole Tribe of Florida expressed concern about effects of anticipated "additional related infrastructure, such as fencing, security, and access for periodic maintenance and troubleshooting." Keetoowah Br. Add. 114, Decl. of Paul Backhouse, ¶ 28. While the Commission asserted that "deployment of small wireless facilities commonly (although not always) involves previously disturbed ground," it eliminated review of small cells that will involve new ground disturbance without responding to concerns about such disturbance. *Order* ¶ 92; *see also, e.g.*, *Comment of the Nat'l Cong. of Am. Indians, et al.* (NCAI), J.A. 430-31 (expressing concern about small cells that require ground disturbance); *Comment of the Cities of Bos., Mass., et al.*, J.A. 707 ("No explanation is offered by the Commission for its exclusion of any ground disturbance related conditions" in the draft *Order*).

The Commission also failed to assess the harms that can attend deployments that do not require new construction, particularly the cumulative harms from densification. While "Tribal Nations are most concerned with federal undertakings that disturb the ground and turn up dirt," even "[c]ollocations can affect cultural and historical properties th[r]ough disturbing view sheds" because "[t]he cultural and spiritual

traditions of Tribal Nations across the United States frequently involve the uninterrupted view of a particular landscape, mountain range, or other view shed." *Comment of NCAI*, J.A. 50. The FCC did not respond to historic-preservation commenters warning "that permanent, direct adverse effects will be more likely with small wireless facilities as in many cases they are proposed for installation on or in historic buildings," and "these multi-site deployments have a greater potential to cause cumulative effects to historic properties, cluttering historic districts with multiple towers, antennae, and utility enclosures." *Comment of Tex. Historical Comm'n*, J.A. 794; *see also, e.g.*, *Ex Parte Commc'n of Thlopthlocco Tribal Town Tribal Historic Pres. Officer*, J.A. 690 (noting that the Commission did not discuss "the issue of multiple collocations on the same pole which cumulatively would exceed the volume restriction and would create an adverse impact"); *Comment of Ark. State Historic Pres. Officer*, J.A. 751 ("[A]lthough individual small cells are unlikely to adversely impact individual historic properties or districts, the FCC doesn't address how the large scale, nationwide deployment of 5G and small cells facilities will cumulatively impact cultural and natural resources."). The Commission noted that all facilities remain subject to its limits on radiofrequency exposure, *Order* ¶ 45, but failed to address concerns that it was speeding densification "without completing its investigation of . . . health effects of low-intensity radiofrequency radiation," which it is currently reassessing. *Comment of BioInitiative Working Grp.*, J.A. 235.

The FCC does not reconcile its assertion that planned small cell densification does not warrant review because it will "leave little to no environmental footprint" with the *Order*'s principal deregulatory effect of eliminating review of precisely the new construction and other deployments that the Commission previously considered likely to pose cultural and

environmental risks. The Commission already had in place NEPA categorical exclusions and NHPA programmatic agreements covering most collocations—as well as other kinds of deployments unlikely to have cultural and environmental impacts. What the new *Order* accomplishes, then, is to sweep away the review the Commission had concluded should not be relinquished.

Since the 1970s, the Commission has explained that most collocations on existing towers or buildings are not "major" federal actions and therefore are not subject to NEPA review. *Implementation of NEPA*, 49 F.C.C.2d at 1319-20; 47 C.F.R. §§ 1.1301-1.1319. The FCC's NEPA regulations limit environmental review to a small subset of actions likely to have significant environmental effects, *see* 47 C.F.R. § 1.1307, as well as those actions found through Section 106 review to have adverse effects on historic properties, *see id.* § 1.1307(a)(4). Before it promulgated the challenged rule, the Commission had further shrunk the category of actions that receive individualized NHPA or NEPA review by adopting programmatic agreements and categorical exclusions. In chronological order, it excluded most collocations from individualized review, *see Collocation Agreement*, 47 C.F.R. Pt.1, App. B; adopted "categories of undertakings that are excluded from the Section 106 process because they are unlikely by their nature to have an impact upon historic properties," *Section 106 Agreement*, 20 FCC Rcd. at 1075 ¶ 2; excluded from individualized review new categories of wireless construction and modification unlikely to have historic preservation effects, *see Nationwide Programmatic Agreement for Review Under the National Historic Preservation Act*, 70 Fed. Reg. at 558; and, most recently, expanded NHPA and NEPA exclusions for collocations, *see Improving Wireless Facilities Siting Policies*, 29 FCC Rcd. at 12870 ¶ 11. In sum, the FCC had already streamlined and

minimized review of vast numbers of minor actions, focusing attention only on subcategories of deployments likely to have cultural or environmental effects.

*Second*, in sweeping away wholesale the review it had preserved for the small cell deployments most likely to be disruptive, the *Order* is not, as the FCC asserts, "consistent with the Commission's treatment of small wireless facility deployments in other contexts," but directly contrary to it. *Order* ¶ 42. We observe by way of example the Commission's assertion that "under the Collocation [Agreement], the Commission already excludes" from NHPA review "many facilities that meet size limits similar to those" of small cells. *Id.* As the Commission sees it, the *Order* thus "builds upon the insight underlying these existing rules that small wireless facilities pose little or no risk of adverse environmental or historic preservation effects." *Id.* But the *Collocation Agreement* exclusion was defined not just by size, but by other characteristics that minimized the likelihood of cultural harm. The section of the *Collocation Agreement* the FCC cites in fact only excludes from individualized NHPA review "small wireless antennas and associated equipment on building and non-tower structures that are outside of historic districts and are not historic properties," which include property of religious and cultural importance to Tribes. *Collocation Agreement*, 47 C.F.R. Pt.1, App. B § VI (formatting altered); *see also* 54 U.S.C. §§ 300308, 302706. A different section of the *Collocation Agreement*, which did exempt certain collocations of small antennas in historic districts or on historic properties, likewise included numerous conditions to minimize effects on historic properties. An antenna could only be collocated on a historic property if, for example, "a member of the public, an Indian Tribe, a [State Historic Preservation Office] or the [Advisory] Council" had not complained "that the collocation ha[d] an adverse effect on one or more historic properties,"

*Collocation Agreement*, 47 C.F.R. Pt.1, App. B § VII(A)(6), and if the antenna was installed "using stealth techniques that match or complement the structure on which or within which it is deployed," *id.* § VII(A)(2)(c), and "in a way that does not damage historic materials and permits removal of such facilities without damaging historic materials," *id.* § VII(A)(4), among other conditions. After the *Order*, none of those limiting conditions applies. The insight of the *Collocation Agreement* was not that small cells by their nature "pose little or no risk of adverse environmental or historic preservation effects," *Order* ¶ 42, but that small cells under certain carefully defined conditions pose little such risk.

Similarly, the FCC explains its "conclusion that, as a class, the nature of small wireless facility deployments appears to render them inherently unlikely to trigger environmental and historic preservation concerns" by reference to limiting criteria that it chose *not* to place on its small cell exemption. *Id.* ¶ 92. It notes, for example, that "deployment of small wireless facilities commonly (although not always) involves previously disturbed ground, where fewer concerns generally arise than on undisturbed ground," and reiterates that "use of existing structures, where feasible, can both promote efficiency and avoid adverse impacts on the human environment." *Id.* But the Commission decided not to limit the *Order*'s exemption only to facilities sited on previously disturbed ground, or those that are collocated on existing structures. It therefore fails to justify its conclusion that small cells "as a class" and by their "nature" are "inherently unlikely" to trigger concerns.

By ignoring the extent to which it had already streamlined review, the Commission also overstated the burdens of review. It said it could not "simply turn a blind eye to the reality that the mechanical application of [limited approval authority] requirements to each of [the] small deployments" necessary for

5G "would increase the burden of review both to regulated entities and the Commission by multiples of tens or hundreds." *Id.* ¶ 65. As the preceding discussion of the *Collocation Agreement* illustrates, however, the FCC was not indiscriminately or "mechanic[ally]" requiring full NHPA and NEPA review for each individual small cell. The Commission fails to explain why the categorical exclusions and programmatic agreements in place did not already minimize unnecessary costs while preserving review for deployments with greater potential cultural and environmental impacts.

*Third*, given that only the most vulnerable cases were still subject to individualized NHPA or NEPA review, the Commission did not adequately address either the possible benefits of retaining review, or the potential for further streamlining review without eliminating it altogether. It dismissed the benefits of historic-preservation and environmental review in a two-sentence paragraph, describing most of the comments that highlight those benefits as "generalized" and the comments that point to specific benefits as "few." *Id.* ¶ 78. Characterizing a concern as "generalized" without addressing that concern does not meet the standard of "reasoned decisionmaking." *Michigan v. EPA*, 135 S. Ct. at 2706.

The Commission found that adverse effects are rare, but it considered neither the importance of the sites review does save, nor how that rarity depends on the very review it eliminates, which forestalled adverse effects that otherwise would have occurred. The FCC cited comments suggesting that only 0.3 or 0.4% of requests for Tribal review result in findings of adverse effects or possible adverse effects. *Order* ¶ 79. Based on the estimate of 800,000 small cell deployments, that could mean 3,200 adverse effects. The *Order* displayed no consideration of the importance of the 3,200 Tribal sites that might be saved

through review except to describe that benefit as "*de minimis* both individually and in the aggregate." *Id.* As counsel for petitioner Blackfeet Tribe said at oral argument: "They may think that's infinitesimal. To us, it means the world." Oral Argument at 1:16:16-20. The Commission also did not address comments that "no adverse effects in 99% of tower deployments shows that the current system is working" because "[o]ften, after an applicant enters a location into" the Tower Construction Notification System, a Tribal representative "will notify the applicant of an issue and the applicant will choose a new location or resolve that effect," which "gets counted as having no adverse effect." *Comment of Nat'l Ass'n of Tribal Historic Pres. Officers*, J.A. 661. Other commenters agreed that "[t]he lack of significant impact should be a testament to the value of the review process in these instances, not negate its necessity." *Comment of Tex. Historical Comm'n*, J.A. 794 ("In our experience, the vast majority of adverse effects for cell projects are resolved through sensitive design modifications, including stealth measures, modifying how equipment is attached if directly mounted to a historic building or structure, or relocation to an alternate site further removed from historic properties.").

Similarly, the Commission dismissed the point that its own oversight deters adverse effects by describing comments to that effect as "generalized, and undercut by our conclusion that, as a class, the nature of small wireless facility deployments appears to render them inherently unlikely to trigger environmental and historic preservation concerns." *Order* ¶ 92. For the reasons already explained, the FCC's conclusion that small cells are inherently unlikely to trigger concerns is arbitrary and capricious, and describing comments as "generalized" does not excuse the agency of its obligation to consider those comments as part of reasoned decisionmaking.

We hold that the *Order*'s deregulation of small cells is arbitrary and capricious because its public-interest analysis did not meet the standard of reasoned decisionmaking. We therefore decide neither the alternative grounds for holding that the *Order* is arbitrary and capricious or otherwise violated the Administrative Procedure Act, nor the claim that small cell construction is a federal undertaking and a major federal action requiring NHPA and NEPA review.

## II. Tribal Involvement in Section 106 Review

The *Order* also made three changes to Tribal involvement in the Section 106 review not eliminated by the *Order*, such as review of macrocells and small wireless facilities on Tribal land. The first two changes relate to two types of Tribal involvement that the Commission and the Advisory Council distinguish from one another: (a) government-to-government consultation between the agency and the Tribes, in which Tribes function in their governmental capacity, and (b) the "identification and evaluation phase of the Section 106 process when the agency or applicant is carrying out its duty to identify historic properties that may be significant to an Indian tribe." Advisory Council, *Consultation with Indian Tribes in the Section 106 Review Process: A Handbook* (*Section 106 Handbook*), J.A. 1015; *see also* FCC, *Voluntary Best Practices for Expediting the Process of Communications Tower and Antenna Siting Review Pursuant to Section 106 of the NHPA*, J.A. 933; *Order* ¶¶ 118-19.

Section 106 review comprises "four steps": "initiation, identification, assessment [or evaluation], and resolution." *Section 106 Handbook*, J.A. 1018. Government-to-government consultation is a background requirement of Section 106 review at every stage. *See id.* at J.A. 1014, 1018; Advisory Council, *Fees in the Section 106 Review Process*,

J.A. 913; 36 C.F.R. § 800.2(c)(2)(ii)(A) (consultation requires giving the interested Tribe "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, . . . articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects"). In the identification and evaluation period, however, applicants have often paid for expertise and assistance from Tribes acting "in a role similar to that of a consultant or contractor" such as by providing "specific information and documentation regarding the location, nature, and condition of individual sites" or even conducting surveys. *Section 106 Handbook*, J.A. 1015. The *Order* explains that identification and evaluation involves "activities undertaken after the initial determination that historic properties are likely to be located in the site vicinity," and that it includes "monitoring and other activities directed toward completing the identification of historic properties as well as assessing and mitigating the project's impacts on those properties." *Order* ¶ 124.

The "initial determination" falls into the government-to-government consultation category. *See Section 106 Handbook*, J.A. 1021 (explaining that initiating contact with Tribes is part of the Commission's "responsibilities to conduct government-to-government Consultation"). In practice, however, Tribes have been allowing applicants to contact them directly, in lieu of government-to-government consultation, to help make the initial determination. *See Section 106 Agreement*, 20 FCC Rcd. at 1108 ¶¶ 95-96; Keetoowah Br. 37. The *Section 106 Agreement* "expresses the ambition that this initial contact will lead to voluntary direct discussions through which applicants and tribes . . . will resolve questions involving the presence of relevant historic properties and effects on such properties to the tribe['s] . . . satisfaction without Commission involvement." 20 FCC Rcd. at 1108 ¶ 97. But "if an applicant and an Indian

tribe . . . disagree regarding whether an undertaking will have an adverse effect on a historic property of religious and cultural significance, or if the tribe . . . does not respond to the applicant's inquiries," the Commission steps in to consult and ultimately "make a decision regarding the proposed undertaking." *Id.*

The Advisory Council explains that "[t]hese two tribal roles"—government-to-government consultation, and assistance with identification and evaluation—"are not treated the same when it comes to compensation, although the line between them may not be sharp." Advisory Council, *Fees in the Section 106 Review Process*, J.A. 913. Advisory Council guidance states that "agencies are strongly encouraged to use available resources to help overcome financial impediments to effective tribal participation in the Section 106 process" and applicants are likewise "encouraged to use available resources to facilitate and support tribal participation." Advisory Council, *Section 106 Handbook*, J.A. 1015. At the same time, it says that agencies and applicants should not expect to pay fees for government-to-government consultation, which "give[s] the Indian tribe an opportunity to get its interests and concerns before the agency," Advisory Council, *Fees in the Section 106 Review Process*, J.A. 913, but "should reasonably expect to pay" fees for the identification and evaluation, which puts Tribes in a "consultant or contractor" role, Advisory Council, *Section 106 Handbook*, J.A. 1015. It notes, however, that "this encouragement is not a legal mandate; nor does any portion of the NHPA or the [Advisory Council's] regulations require an agency or an applicant to pay for any form of tribal involvement." *Id.*

First, apparently because applicants had been consistently paying upfront fees, *see* Keetoowah Br. 37, the *Order* made clear that applicants' payment of upfront fees to Tribes is

voluntary. *See Order* ¶ 116. Upfront fees are payments made to Tribes for the initial determination whether the Tribe actually has religiously or culturally significant properties that might be affected by a proposed construction. *See id.* ¶ 116. Applicants contact Tribes for that initial determination when Tribes have noted that properties in the general area of proposed construction may have religious or cultural significance for them. *Id.* When an applicant follows up "to ascertain whether there are in fact such properties that may be affected," some Tribes have requested upfront fees before they will respond. *Id.* As the *Order* describes the practice, the upfront fees "do not compensate Tribal Nations for fulfilling specific requests for information and documentation, or for fulfilling specific requests to conduct surveys," but are "more in the nature of a processing fee" to "obtain a response" to an applicant's initial Tower Construction Notification contact with a Tribal Nation. *Id*. ¶ 119.

Second, while the *Order* approved of fees for identifying and evaluating properties that may be significant to Tribes, as opposed to upfront fees, *see id.* ¶ 123, it also authorized applicants to consult with non-Tribal parties in the identification and evaluation phase, *see id.* ¶¶ 124-45. The Commission found that, if an applicant asks a Tribe to perform work to aid it in documenting, surveying, or analyzing potentially historic properties, "the applicant should expect to negotiate a fee for that work" and, if the parties are "unable to agree on a fee, the applicant may seek other means to fulfill its obligations." *Id.* ¶ 125. "The agency or applicant is free to refuse just as it may refuse to pay for an archeological consultant, but the agency still retains the duties of obtaining the necessary information for the identification [and evaluation] of historic properties . . . through reasonable means." *Id*. (quoting Advisory Council, *Section 106 Handbook*, J.A. 1015).

Third, the *Order* shortened from 60 to 45 days the timeline for Tribes to respond to notifications on the Tower Construction Notification System, eliminated the requirement that applicants make a second attempt to contact Tribes, and shortened from 20 to 15 days the timeline for Tribal response to Commission contact. *Id.* ¶¶ 110-11.

Keetoowah and Blackfeet challenge those three changes as arbitrary and capricious and inconsistent with the NHPA. Keetoowah complains that the *Order* "encourages applicants, which have until this point voluntarily paid fees, to refuse paying Tribes" upfront fees, Keetoowah Br. 37; that "FCC implementation goes far beyond the terms of the Order by refusing to even allow Tribes to request voluntary fees through" the Tower Construction Notification System, *id.* at 37-38; that letting applications proceed where Tribes refuse to participate without compensation or are not hired as consultants violates the Commission's legal obligation to consult with Tribes, *id.* at 38; and that the shortened timelines are unreasonable, *id.* at 40. Blackfeet asserts that the Commission lacks "the authority to prohibit tribes from collecting fees" because only the Advisory Council may promulgate regulations implementing Section 106. Blackfeet Br. 16.

None of those challenges is availing. The clarification that applicants are not required to pay upfront fees is consistent with the Advisory Council's preexisting guidance and does not violate the Commission's duty to consult with Tribes. The *Order* permissibly authorizes applicants to contract with non-Tribal parties in the identification-and-evaluation phase because it stipulates that contractors must be "properly qualified," which we understand does not authorize hiring other contractors in any circumstance in which only Tribes are

qualified. *Order* ¶ 128. The shortened timeline for Tribal response is reasonable and sufficiently explained.

## A. Upfront Fees

The *Order* permissibly confirms that upfront fees for Tribes to comment on proposed deployments are voluntary. Unchallenged Advisory Council regulations already make clear that fees are voluntary, so the *Order*'s reiteration of the same point is not arbitrary and capricious. While applicants have apparently been uniformly paying upfront fees for Section 106 review, no party asserts that they have been required to do so. *See* Keetoowah Reply Br. 20. The Advisory Council has been explicit that no "portion of the NHPA or the [Advisory Council's] regulations require an agency or an applicant to pay for any form of tribal involvement." Advisory Council, *Section 106 Handbook*, J.A. 1015; *see also* Advisory Council, *Fees in the Section 106 Review Process*, J.A. 913 (neither the NHPA nor Advisory Council regulations "requires Federal agencies to pay for any aspect of tribal [or] other consulting party participation in the Section 106 process"). Blackfeet's complaint that "[t]he FCC does not have the authority to prohibit tribes from collecting fees" and that the *Order* is impermissibly "implementing and administering Section 106 through regulation" is misplaced. The challenged *Order* contains no such prohibition, but does no more than recognize and reiterate the Advisory Council's existing rule.

The Commission has a non-delegable duty to consult with Tribes about the effect of federal undertakings on property significant to the Tribes, which Tribes can invoke or waive as they choose. The NHPA mandates that, "[i]n carrying out its responsibilities under [Section 106], a Federal agency shall consult with any Indian tribe . . . that attaches religious and cultural significance to property." 54 U.S.C. § 302706(b). The

Advisory Council has explained that "federal agencies cannot unilaterally delegate their tribal consultation responsibilities to an applicant," but can only delegate if "expressly authorized by the Indian tribe to do so." Advisory Council, *Limitations on the Delegation of Authority by Federal Agencies to Initiate Tribal Consultation under Section 106 of the National Historic Preservation Act* (*Limitations on Section 106 Delegation*) 1 (2011), https://go.usa.gov/xyWGq. The Commission has also recognized that its "fiduciary responsibility and duty of consultation [to Tribes] rest with the Commission as an agency of the federal government, not with licensees, applicants, or other third parties." *Section 106 Agreement*, 20 FCC Rcd. at 1106 ¶ 91.

Keetoowah says its challenge is not to the "FCC's clarification that fees are voluntary," but to "the Order's determination that FCC will process applications without tribal input if tribes insist on charging applicants for their reviews." Keetoowah Reply Br. 19-20. That determination, Keetoowah asserts, violates the Commission's "statutory obligation to consult with tribes." *Id.* at 19. Under the *Section 106 Agreement*, Tribes can and do permit applicants to contact them to request review of proposed construction—essentially agreeing to accept that contact in satisfaction of the Commission's responsibility to consult with Tribes directly. 20 FCC Rcd. at 1108 ¶ 96; *see also* Keetoowah Br. 37; *Comment of the Seminole Tribe of Florida*, J.A. 743 ("[T]ribes participate in review . . . on a voluntary basis" as a substitute for "direct Section 106 consultation with the FCC.") But Tribes can request "the federal agency to reenter the consultation process at any time . . . since the federal agency remains responsible for government-to-government consultation." *Limitations on Section 106 Delegation* 2. Keetoowah implies that Tribes have only agreed to accept direct contact from applicants under the condition that

applicants pay for Tribes' responses—meaning that if Tribes refuse to respond without being paid upfront fees, they will not have waived the Commission's responsibility to consult with them directly. Without having fulfilled its legal obligation to consult, Keetoowah contends, the Commission cannot permit applicants to go ahead with construction.

Keetoowah overlooks the fact that when a Tribe refuses to review an application without being paid, the *Order* requires the Commission to step in to ask the Tribe for a response before allowing applicants to construct. Tribes' refusal to respond triggers a process in which applicants can refer the matter to the Commission, the Commission must contact Tribes directly, and Tribes have 15 days from Commission contact to respond. *See Order* ¶ 111. Only if the Tribe does not timely respond to the Commission are "the applicant's pre-construction obligations . . . discharged with respect to that Tribal Nation." *Id.* The Tribe is guaranteed the opportunity to consult as a sovereign—a capacity in which it need not be paid—and the Commission cannot force an unwilling Tribe to respond. Therefore, if a Tribe refuses to respond when the Commission requests its views on an application, the Commission has discharged its obligation of direct Commission-to-Tribe consultation. *See id.* ¶ 111. Apart from the shortened timeframe, discussed below, Keetoowah has not offered any reason the Commission's contacting Tribes directly with a request to consult that the Tribe rejects does not satisfy the Commission's consultation obligation.

Finally, the objection that the Commission is prohibiting Tribes from requesting voluntary fees on the Tower Construction Notification System, Keetoowah Br. 38-40, is not properly before us. That prohibition does not appear in the *Order* itself but seems to originate with a later decision of Commission staff. *See* Resp't Br. 64 n.19.

## B. Non-Tribal Consultation

The *Order* states that applicants need not contract with Tribes to identify which properties have historic or cultural significance to Tribes and determine how to assess or mitigate adverse effects of construction. *Order* ¶¶ 124-25, 128-29. Keetoowah argues that allowing applicants to contract with non-Tribal parties is arbitrary and capricious because "only Tribes are qualified to perform" such services "based on their unique, often sacred, knowledge." Keetoowah Br. 23. Because the *Order* stipulates that contractors must be "properly qualified," we reject the arbitrary-and-capricious claim. *Order* ¶ 128.

Advisory Council regulations require the agency to "make a reasonable and good faith effort to carry out appropriate identification efforts" under Section 106. 36 C.F.R. § 800.4(b)(1). The *Order* explains that "the applicant is not bound to any particular method of gathering information," *Order* ¶ 125, but it stipulates that contractors must be "properly qualified," *id.* ¶ 128. The "reasonable and good faith efforts" standard together with the *Order*'s mandate that parties be "properly qualified" may sometimes require applicants to hire Tribes—for instance, where Tribes have "unique" and "sacred" knowledge of historic properties. Advisory Council guidance supports that notion, explaining that "unless an archeologist has been specifically authorized by a tribe to speak on its behalf on the subject, it should not be assumed that the archaeologist possesses the appropriate expertise to determine what properties are or are not of significance to an Indian tribe." *Section 106 Handbook*, J.A. 1022. The *Order* itself suggests that applicants should try to hire Tribes first: "[I]f an applicant asks a Tribal Nation" to perform identification and evaluation of historic properties, "the applicant should expect to negotiate a fee for that work," but if the Tribe and applicant "are unable

to agree on a fee, the applicant may seek other means to fulfill its obligations." *Order* ¶ 125. We cannot say, *ex ante*, how often as a practical matter applicants might find qualified non-Tribal contractors or whether, as applied, the law will ordinarily require hiring Tribes. If a Tribe believes an applicant has hired an unqualified contractor, that issue can be litigated when it arises.

## C. Timeline Changes

Keetoowah's one-paragraph challenge to the *Order*'s shortening the timeline for Tribal response to Tower Construction Notification System notifications provides no basis on which to hold the shortened timeline arbitrary and capricious. Keetoowah Br. 40. Its sole objection is that Tribes "operate with limited staff and budget, making the shortening of Tribal review time unreasonable." *Id.* The Commission acted within its discretion and "considered the relevant factors and articulate[d] a rational connection between the facts found and the choice made." *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1241 (D.C. Cir. 2007) (quoting *BellSouth Telecomms., Inc. v. FCC*, 469 F.3d 1052, 1056 (D.C. Cir. 2006) (alteration in original)). It reasonably justified the decision as a compromise between industry requests for even shorter timelines to address delays, and Tribes' need for adequate time to review submissions. *See Order* ¶¶ 112 n.262, 113.

## III. Promulgation of the *Order* Itself

All petitioners argue that the promulgation of the *Order* itself violated the law. Keetoowah and Blackfeet argue that the Commission violated its duty to consult with Tribes, as established by the Tribes' sovereign status and the government-to-government relationship recognized in Article I, Section 8 of the Constitution, the NHPA, and the Commission's regulations. *See* Keetoowah Br. 40-42; Blackfeet Br. 20-21.

The NRDC argues that the *Order* itself was a major federal action that required NEPA review. *See* NRDC Br. 10-11. Because the *Order* documents extensive consultation with Tribes, we reject the first contention. We lack jurisdiction to consider the second because the NRDC forfeited it by failing to raise it to the Commission.

As for the Tribes' contention that the *Order* is invalid because the Commission did not meet its obligations to consult with Tribes, the Commission responds that it extensively consulted with Tribes, and that in any event its consultation obligation is not judicially enforceable. Resp't Br. 69-74. We conclude that the Commission fulfilled its obligation to consult. The Commission presented abundant evidence that it "consulted" Tribes in the ordinary sense of the word, and the Tribes have offered no other concrete standard by which to judge the Commission's efforts.

On this record, we cannot say that the Commission failed to consult with Tribes in its meetings and other communications, which began in 2016 and continued through early 2018. *See Order* ¶¶ 19, 34. The Commission documented extensive meetings it held with Tribes before it issued the *Order*. *See Order* ¶¶ 19-35. Under Advisory Council regulations, "[c]onsultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f); *see also* 54 U.S.C. § 302706(b). The dictionary definition of consulting is "seek[ing] advice or information of." *Consult*, *American Heritage Dict.* (5th ed. 2019). Keetoowah complains that the FCC's efforts were "listening sessions, briefings, conference calls, and delivery of remarks by a Commissioner" rather than "consultations," and presents evidence that Tribes did not view these meetings as

consultations. Keetoowah Br. 44. But it offers no standard by which to judge which consultations were "listening sessions" or whether a "listening session" or a conference call qualifies as a consultation. The only case Keetoowah cites interpreting an agency's failure to consult is inapposite: there, an agency official "acknowledged at trial" that the contested decision "had already been made prior to" the first meeting between Tribal members and agency officials discussing the decision. *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 710 (8th Cir. 1979). No evidence in this record suggests the Commission had already determined the *Order*'s substance before meeting with Tribes—and the series of communications and meeting commenced even before the Commission issued the Notice of Proposed Rulemaking. *See Order* ¶ 19. The Commission appeared to "seek[], discuss[], and consider[] the views of" the Tribes, even if it did not ultimately adopt those views.

The NRDC argues that promulgating the *Order* was itself a major federal action that required NEPA review. *See* NRDC Br. 10-11. But, as intervenor CTIA points out, the NRDC forfeited that argument by failing to make it to the Commission, *see* CTIA Br. 38, and we lack jurisdiction to review a claim that was not raised there. *Free Access & Broad. Telemedia, LLC v. FCC*, 865 F.3d 615, 619 (D.C. Cir. 2017). While the NRDC points to its own and others' comments "urg[ing] the Commission to conduct a NEPA analysis," NRDC Reply Br. 3, none of those comments said the Commission was required to perform a NEPA analysis *of the Order*. The NRDC cites its own comment "that if the FCC sought to exclude an entire category of wireless facilities from NEPA, it was required to establish a categorical exclusion." *Id.* (citing J.A. 787-90). But the NRDC did not there contend, as it now does, that the *Order* is a major federal action. Rather, the NRDC's argument was that the federal character of the

geographic area license meant that the Commission could not entirely exempt wireless facility construction from NEPA review, J.A. 790—the same statutory argument it made here—and that the proper approach to exempting federal "activities that by their nature do not have significant impacts on the environment is with a categorical exclusion," J.A. 789. Whether the licenses or construction are federal, the basis of the NRDC's argument, is irrelevant to the question whether the *Order* overall is a major federal action that requires NEPA review. One of the other two comments it cites asserted that the proposed rule failed to comply with NEPA, but again, not because the *Order* required NEPA analysis—rather because the issuance of licenses constitutes a major federal action. *See Comment of the Nat'l Trust for Historic Pres.*, J.A. 770. The third comment urged the Commission to consider the cumulative effects of radiofrequency exposure, but did not even mention NEPA. *See Comment of BioInitiative Working Grp.*, J.A. 235-38. The argument that the *Order* required independent NEPA review was never fairly before the Commission.

## CONCLUSION

We grant the petitions to vacate the *Order*'s removal of small cells from its limited approval authority and remand to the FCC. We deny the petitions to vacate the *Order*'s changes to Tribal involvement in Section 106 review and to vacate the *Order* in its entirety.

*So ordered.*